4

[618 NYS2d 660]

In the Matter of FRANCIS S., Also Known as FRANCIS S., Respondent. DISTRICT ATTORNEY OF NEW YORK COUNTY et al., Appellants.

First Department, November 15, 1994

## APPEARANCES OF COUNSEL

*Birgit E. Kollmar* of counsel *(Morrie I. Kleinbart* and *Gary J. Galperin* on the brief; *Robert M. Morgenthau, District Attorney* of New York County, attorney), appellant *pro se.*

*Howard L. Zwickel* of counsel *(Yolanda M. Pizarro* and

*Edward J. Curtis, Jr.,* on the brief; *G. Oliver Koppell, Attorney-General,* attorney), for Commissioner, New York State Office of Mental Health, appellant.

*Stephen J. Harkavy* of counsel *(Starr McFerrin-Clancy* and *Julie Stoil* on the brief; *Marvin Bernstein,* Mental Hygiene Legal Service, attorney), for respondent.

*John J. Clarke, Jr.,* of counsel *(Frank S. Moseley* on the brief; *Davis Polk & Wardwell,* attorneys), for American Alliance for Rights and Responsibilities and others, *amici curiae.*

### OPINION OF THE COURT

Per Curiam.

The central issue on this appeal is whether an acquittee by reason of mental disease or defect, who has repeatedly violated the order of conditions upon which he gained release, and who is still mentally ill and a polysubstance abuser given to acts of violence, may still be found to be not suffering from a dangerous mental disorder because at the time of the hearing on recommitment pursuant to CPL 330.20 (14) the acquittee, under the structured environment of a psychiatric hospital, is not presently exhibiting dangerous behavior.

■ After lengthy hearings, the Supreme Court found that the acquittee, respondent Francis S., is mentally ill, and suffers from alcoholic dependence and polysubstance abuse; has an antisocial personality disorder; has a narcissistic personality disorder; has an attention deficit hyperactivity disorder; is a master of manipulation; uses the criminal justice system to his benefit; is highly likely to get into trouble again upon release from the hospital because he refuses to take medication or to attend Alcoholics Anonymous meetings; and cannot control himself to refrain from escalating incidents leading to numerous arrests. Nevertheless, the court felt constrained to release S. and not to grant the application for recommitment upon the authority of *Matter of Torres (People),* (166 AD2d 228, *affd for reasons stated* 78 NY2d 1085) because S. was not, at the time of the hearing, suffering from a dangerous mental disorder even though the reason for this improved condition was the fact that he had been hospitalized for some six months, and on a regimen of medication and separation from polysubstance abuse. We find that the court's reliance on *Matter of Torres (supra)* was misplaced; that the appellants established, by a fair preponderance of the evi-

dence, and in fact by clear and convincing evidence, that S. suffered from a dangerous mental disorder at the time of the hearing, and accordingly the petition for recommitment pursuant to CPL 330.20 (14) should have been granted.

This recommitment proceeding has its genesis in a 1983 incident. At that time, S. was at the scene of a drug raid for the purposes of purchasing marihuana. He refused the order of a police officer to leave and was arrested for disorderly conduct. As he was being placed under arrest, S. pulled out a six-inch hunting knife and attempted to stab the officer. As a result, S. was also charged with attempted assault in the first degree and criminal possession of a weapon in the third degree. Following arraignment on these charges, he was released on his own recognizance and then engaged in various criminal acts in New Jersey, which resulted in his arrest and confinement at Greystone Psychiatric Center. During his confinement, which lasted from May 17, 1984 until April 29, 1986, S. reported aural and visual hallucinations, claiming in one instance that he was seeing snakes, bugs and images of Satan and was hearing voices telling him to get a gun and blow his brains out. S. also claimed that he communicated with God, worked for God, was God, that he feared that Satan would kill him because he was an archangel, and that he was depressed and wanted to die.

As a result of the observations as well as examinations of respondent, S. was diagnosed as a chronic undifferentiated schizophrenic with acute exacerbation. His treating psychiatrist prescribed a high dosage of antipsychotic medication. Greystone's doctors agreed that S. presented a danger to himself and others and thus, despite the medication's beneficial effects, required continued hospitalization on a closed ward until he was stabilized on it. On August 21, 1984, S. escaped from Greystone using a spoon he had fashioned into a key that could open a security lock. He was quickly apprehended, returned to Greystone, and ultimately stabilized on Prolixin.

On April 29, 1986, S. was discharged from Greystone and extradited to New York to face prosecution on the 1983 attempted assault and weapon charges. The discharge diagnosis reported that he remained a chronic undifferentiated schizophrenic but was in remission because of his hospitalization and treatment at Greystone, and was no longer hostile or violent. The doctor who discharged S. recommended that he

receive aftercare at a local New York City mental health center upon release from custody.

Upon being returned to New York, S. was released on his own recognizance. In February 1987, while drunk and without a driver's license, S. drove his car into a parked car in Manhattan, causing a multivehicle accident. As a result, S. was charged with reckless endangerment of property, reckless driving, and driving while intoxicated. One month later, S. was found in possession of three glassine envelopes of heroin and was charged with criminal possession of a controlled substance in the seventh degree, to which he pleaded guilty, and served a short prison sentence.

On August 7, 1987, before Justice Kleiman, respondent pleaded not guilty by reason of mental disease or defect in satisfaction of the 1983 indictment for attempted assault of the police officer and weapon possession, and following a hearing pursuant to CPL 330.20 (7), was found to be mentally ill, but not suffering from a dangerous mental disorder, as those terms are defined in CPL 330.20 (1) (c) and (d). Accordingly, S. was remanded to a nonsecure facility for four months under the custody of the New York State Office of Mental Health. In addition, Justice Kleiman issued a five-year order of conditions, which required that S. comply with the terms of the treatment plan prescribed by the Office of Mental Health. As a result of the plea before Justice Kleiman, the charges relating to the car accident noted above were dismissed.

In May of 1988, the Commissioner of the New York State Office of Mental Health brought a recommitment application pursuant to CPL 330.20 (14). In support of the application, Dr. Maurice Masse stated that S. was not compliant with his treatment. During the pendency of that application, S. continued his substance-induced violent behavior. On June 4, 1988, he was arrested and charged in New Jersey for shoplifting and aggravated assault on a police officer. On July 27, 1988, he was arrested for driving while intoxicated. Then, at around midnight on November 2, 1989, S. threatened a bartender and patrons at Canastel's restaurant, on the corner of 19th Street and Park Avenue South in Manhattan, with a 10-inch-long metal pipe wrapped in leather. Police Officer Daniel Pusateri encountered S. outside of the restaurant after he had been ejected but then tried to get back inside. Officer Pusateri asked S. to leave the area, but he refused and swung his arms around and yelled. As S. was being placed under arrest for disorderly conduct, he bit the officer on the hand. As a result,

S. was charged with assault, resisting arrest, menacing and criminal possession of a weapon. On November 5, 1989 S. pleaded guilty to assault in the third degree and was sentenced to 30 days in jail.

On December 3, 1989, immediately after his release from custody on those charges, S. visited the Coastal Restaurant on Amsterdam Avenue in Manhattan. When he was asked to leave the restaurant, he kicked in a glass panel door. When police officers arrived to arrest S., he threatened the officers, "I will kill you. I will find out where you live. I will cut you up." S. was charged with criminal trespass and several counts of criminal mischief, but was apparently released on his own recognizance.

On December 13, 1989, S. again became involved in an altercation with a bartender, this time at Bamboo Bernies Cocktail Lounge in Manhattan. S. threatened to hit the bartender with a metal pipe, shouting at the bartender, "I'm going to get you." He pounded the metal pipe on the counter of the bar, damaged the bar and broke several glasses. Once again, when the police arrived to arrest S., he threatened the officers, exclaiming "I am going to sneak up behind you and your partner when I get out and blow you two away; when I get out I'm going back there [Bamboo Bernies] and blow those guys away. Mark my words, I'm gonna do it. They are going to be dead and so are you. You're gonna be dead and I'm gonna laugh and spit in your face." S. was charged with criminal possession of a weapon, two counts of criminal mischief, and menacing. On January 10, 1990, S. pleaded guilty to criminal mischief and was sentenced to 90 days in jail, apparently covering charges arising out of the December 3, 1989 incident also.

In January of 1990, S. was arrested and brought into the custody of the Commissioner of Mental Health and committed to the Kirby Forensic Psychiatric Center. Based on this commitment and examination by doctors, S. was deemed to suffer from a dangerous mental disorder. However, following a hearing and after S. had been in a hospital for some time, he was found to be mentally ill by Justice Shorter, but not suffering from a dangerous mental disorder. As a result, Justice Shorter ordered S.'s commitment in a nonsecure facility. Justice Shorter also altered the conditions and specifically required that S. refrain from the use of alcohol, nonprescribed controlled substances and illegal drugs.

S. was transferred to South Beach Psychiatric Center, a nonsecure facility, and was again diagnosed as suffering from manic bipolar disorder and antisocial personality disorder. His diagnosis remained the same upon discharge in November 1990. A treatment plan was prepared pursuant to which S. was to reside with his parents, continue his medication and get psychiatric treatment at Batavia clinic pursuant to the continuing order of conditions.

On June 17, 1991, S. was arrested in New Jersey for weapons possession and driving while intoxicated. The disposition of that arrest was unknown at the time of the hearing. On July 13, 1991, S. and his girlfriend Colleen Bruck were observed in Southampton, Long Island shouting obscenities at a police officer who had issued Ms. Bruck a parking summons. Officer Stephen O'Brien placed the two under arrest for disorderly conduct, but S. resisted violently, kicking and pushing the officers who had arrived on the scene. S. kicked the doors and windows of the police car taking him to the station house, and at the station house head-butted Officer O'Brien and kicked him in the groin. S. was charged with assault, resisting arrest and disorderly conduct, which charges were still pending at the time of the hearing. On July 6, 1992, S. got into an argument with his girlfriend, Ms. Bruck, in the course of which he broke the windshield and one of the door windows of her automobile. S. was charged with criminal mischief arising out of this incident.

On August 4, 1992, the Office of Mental Health (OMH) brought a recommitment application pursuant to CPL 330.20 (14) based upon its review of S.'s psychiatric records, his arrests in 1991 and 1992, and his persistent noncompliance with the order of conditions. OMH asserted that S. suffered from a dangerous mental disorder. However, OMH was not able to locate S.

On September 8, 1992, S. swung a pair of three-foot sticks at a young couple in Central Park and, when others tried to take the sticks away from him, S. brandished a knife and swung it twice at the young man. S. was arrested on the complaints of the persons he had threatened, whereupon the police found, in addition to the knife, six hypodermic needles and drug paraphernalia in S.'s backpack. One of the arresting officers testified that following his arrest as a result of this incident S. continued to act in a bizarre manner, "howl[ed] like an animal", and ridiculed other inmates. The officer also testified that following fingerprinting, S. washed his hands in the

toilet, despite the fact that a sink was nearby. S. then continued to scream and grab the bars, rattling them back and forth in a very agitated, violent manner—"almost foaming at the mouth". S. was given permission to call his girlfriend, and when she refused to help, he threatened that he would get her and ruin her life if she did not bail him out in the morning.

On September 10, 1992 James Gilbride, chief of security at Kirby Forensic Psychiatric Center, went to Manhattan Criminal Court to execute the outstanding arrest warrant issued by OMH in connection with the recommitment application. All criminal charges pending in Manhattan against S. were dismissed, and S. was placed in the custody of OMH. S. demanded that the Judge ignore the warrant, and when the Judge refused to do so, he called her "a stupid bitch" and threatened to kill her. He then attempted to escape but was subdued. At Kirby, on September 22, 1992, S. appeared before a Supreme Court Justice, and a 30-day examination order was issued. Pursuant to that order, S. was sent to South Beach Psychiatric Center to be evaluated by two doctors to determine whether he suffered from a dangerous mental disorder.

On October 7, 1992, Doctor Delfin G.C. Ibanez, a psychiatrist, examined S. Based on that examination, the doctor's observations of S.'s conduct and a review of his history, both psychiatric and criminal, Dr. Ibanez found that S. had a long history of mental illness and drug abuse. S.'s history of psychiatric illness and behavioral problems had begun manifesting themselves when he was five years old when he experienced hyperactivity and temper tantrums. He had psychiatric help when he was seven years old and was diagnosed as suffering from attention deficit disorder.

In 1982, S. had been hospitalized in a psychiatric institution in Pennsylvania where lithium had been prescribed, but the drug did not work because S. did not take it as ordered. He had also been hospitalized in a psychiatric institution in New Jersey. The records demonstrated that S. was a long-time abuser of drugs and alcohol. As Dr. Ibanez testified, S. admitted that he had begun sniffing glue at the age of 13 and later experimented with LSD. He had also used PCP, intravenous heroin and other opiates.

During his observation of S., Dr. Ibanez noted that he was irritable and had mood swings, his speech was loud, pressured and rapid, he had a restricted affect, and he was hyperactive. Dr. Ibanez described S.'s thinking as circumstantial, tangen-

tial with flight of ideas, with delusions of persecution and grandeur. His persecutory delusions were in the form of his belief that the police and the "system" were abusing him.

S.'s delusions of grandeur were exemplified by his discussion with Dr. Ibanez about a "Pan Am Project" involving construction of a theater on the roof of the Pan Am building at which he would promote international concerts via satellite and would sell photos and posters of John Lennon and Yoko Ono. S. expressed no concern about the owner's view of the project and continued discussing it as if it were an ongoing project. Dr. Ibanez noted that even if S. had designed such a plan it still demonstrated that he was delusional because of the manner in which he discussed it—"the grandiosity, the flavor, the mood that is being presented" that demonstrates the symptom of mania. Similar delusions were S.'s claims that he has multi-million dollar business deals with people in Southampton, Long Island and references to famous people as if he knew them personally.

On October 6, 1992, Doctor Erazmo R. Cruz, a psychiatrist, also examined S., reviewed his psychiatric and criminal history and observed his conduct. He concurred with Dr. Ibanez's descriptions of the length of S.'s psychiatric history, his history of drug abuse, his irritable, moody conduct and the delusional nature of his thinking.

Based on the information available and their observations, Drs. Cruz and Ibanez diagnosed S. as suffering from bipolar disorder, manic and recurrent, polysubstance abuse and antisocial personality disorder. They explained that bipolar disorder could be treated with prescribed antipsychotic medication —Prolixin and lithium—but Dr. Ibanez added that S. often refused to take it and that his failure to take the prescribed medication would result in his descending into a paranoid psychotic episode. During one session, S. told Dr. Ibanez that he did not need medication, and when the medication was ordered in the form of tablets he pretended to take them by "cheeking" and not swallowing them. When the medication was changed to concentrate form, S. refused to take it. Both doctors agreed that S.'s violent conduct outside of the facility, and his numerous arrests, all indicate his descent into a paranoid psychotic state, characterized by a total loss of control, lack of insight and impairment of judgment.

Drs. Cruz and Ibanez agreed that S.'s paranoid symptoms were aggravated by his use of drugs and alcohol, and opined

that it was his abuse of those substances, combined with his failure to take his medication and adhere to an outpatient treatment plan, that caused him to act in an aggressive and violent fashion. According to the doctors, S. has no insight into his various mental illnesses and needs a longer period of time to be educated about his illness and convinced of the extent of the illness. Moreover, according to Dr. Cruz, the denial of his mental illness made S. an escape risk. As a result of their separately conducted examinations, both doctors concluded that S. had a dangerous mental disorder and was in need of care and treatment in a secure facility and that it would be inconsistent with public safety to release him.

Both doctors acknowledged that S. exhibited no symptoms of a dangerous mental disorder and was not psychotic *when he was in a psychiatric institution.* They both testified, however, that this was not unusual since an individual committed against his will would be given medication and forced to comply with a treatment plan. Moreover, an individual such as S. would try to be on good behavior to ensure his release. In short, compliance or lack of dangerousness in a facility does not necessarily mean that an individual does not suffer from a dangerous mental disorder. Noting S.'s history, his impaired judgment, loss of control, psychotic and manic symptoms, and recurrent antisocial behavior, both opined that once S. was released and consequently not monitored in the controlled environment, he would fail to be compliant with any outpatient treatment plan that prescribed medication or required him to attend clinic follow-up appointments.

Based on the conclusions of Drs. Ibanez and Cruz that S. suffered from a dangerous mental disorder, he was transferred to Kirby Forensic Psychiatric Center, a secure psychiatric facility. There Dr. Robert B. Poundstone, a board certified psychiatrist, began treating S. Based on his review of S.'s psychiatric records, observations and conversations with S. and talks with S.'s mother, he diagnosed S. as having a major affective disorder, manic type, and manic bipolar disorder. He added that S. also suffered from other diagnoses including attention deficit disorder (Dr. Cruz disagreed with this particular diagnosis), antisocial personality, alcoholism and drug abuse.

Like Drs. Ibanez and Cruz, Dr. Poundstone, in arriving at his diagnosis, relied on S.'s pressured, rapid-fire speech, signs of grandiosity, paranoid and persecutory delusions, his nonsensical verbal production, and his tangential thought pro-

cesses with flight of ideas. In addition, Dr. Poundstone commented on S.'s "compulsive" behavior, and observed that when confronted with his past psychiatric and criminal history, S. initially denies the events, and then after further questioning he minimizes his conduct.

Dr. Poundstone also explained that S. had repeatedly denied that he was mentally ill, that he needed inpatient care or had a current problem with drugs and alcohol. These denials, according to Dr. Poundstone, substantially interfered with adequate treatment. He agreed with Drs. Cruz and Ibanez that S.'s behavior demonstrated a desire to achieve freedom, not to achieve health. Thus, according to Dr. Poundstone, while in the hospital, S. would "behave" to try to convince the court that he should not be in the hospital. Dr. Poundstone characterized S. as a very clever man, able to fool people to attain certain ends by putting "his best face forward," in order to conceal what might be behind his goal-oriented behavior. Indeed, Dr. Poundstone testified that such manipulative behavior is symptomatic of bipolar disorder.

Finally, Dr. Poundstone was of the opinion that S.'s 26 arrests were symptomatic of S.'s mental illness in that they show his bad judgment and inability to appreciate the consequences of an act, which is a common feature of a manic person. As a result of his evaluation, Dr. Poundstone agreed that S.'s illness required care and treatment in an inpatient facility and that S. was not suitable for discharge because, outside of a psychiatric institution, he reverted to his previous behavior, which included drug and alcohol use, and that S. would be a danger to himself or others.

S. testified at the hearing that the crime for which he entered a not responsible plea resulted from a misunderstanding with a police officer. The police officer wanted a "payoff" to let him walk away but S. refused. S. did not take out a knife and swing it at the police officer. Although he entered a not responsible plea, he was not in fact mentally ill, but rather entered the plea because he did not want to go to jail and "be someone's bitch."

S. conceded that he had been arrested on November 2, December 3, and December 13, 1989, arising from altercations with bartenders at different restaurants in Manhattan; on June 17, 1991, for driving while intoxicated and possession of a weapon; on July 6, 1992, for fighting with his girlfriend Colleen Bruck; and on September 8, 1992, for an incident in

Central Park. S. explained that each bar fight was provoked by the bartender. For example, in the November 2, 1989 incident the bartender had given S. incorrect change, an argument ensued and when the police arrived, despite the officer's requests, S. refused to leave the area and fought for his right to his money. The police allegedly arrested S. because, in his own words, he had "a big mouth".

Similarly, on December 13, 1989, when the bartender at Bamboo Bernies slapped S.'s girlfriend for no reason, S., who had been drinking that day and had a "brash" attitude, confronted the bartender, hit his "drumstick" on the bar and caused the glasses to fall down and break. Once again, when the police arrived, S. tried to explain what happened; however, since the bartender was friends with the police, S. was arrested. S. denied threatening to kill the police officers and made similar denials as to the December 3, 1989 incident.

S. testified that the June 17, 1991 driving while intoxicated charge was falsified, and denied becoming violent and screaming while at the precinct. With respect to the September 8, 1992 incident, S. said it was he who was the victim of an assault. He was in Central Park talking to a girl and before S. knew it, a man grabbed him by the neck and knocked him down, causing him to fall on his binoculars and break them. In response, S. ran over to his backpack, picked up a pair of "drumsticks," gave himself a "safe zone," waved the sticks in the air and called police officers over for assistance.

S. admitted to having had a "bad attitude" towards the police that day, and he insisted that they arrest the people that had attacked him. The police, however, not liking S.'s "big mouth," arrested him instead. At the precinct, S. might have sang and said he felt like a baboon and did "goofy things" in the cell, but he did not howl, and did not wash his hands in the toilet. S. denied drinking or taking drugs on that day, denied having possession of a knife or pulling a knife, and denied being in possession of hypodermic needles.

S. admitted that on July 6, 1992, he broke the window of his girlfriend's car, and she bit him on the arm and hit him with a steering wheel lock. However, as to the charges brought in Southampton, arising from the July 13, 1991 incident, S. refused to testify about the details of the events that transpired because the criminal action was still pending and he had a $5 million lawsuit pending against the police department. However, he testified that the police officers from Southampton had lied.

As to S.'s conduct in the courtroom when the OMH took him into custody on September 10, 1992, Andrea Pincus, a criminal defense attorney for the Legal Aid Society, testified that S. was neither abusive nor profane, and did not threaten to kill the Judge or anyone else. Pincus, however, was not with S. when he was being placed under arrest by Chief Gilbride.

On November 6, 1992, Doctor Azariah Eshkenazi, a board-certified, court-appointed psychiatrist, examined S. for one hour. Based on that interview, as well as his review of S.'s medical records and talks with the current treating psychiatrist, Dr. Poundstone, Dr. Eshkenazi concluded that S. suffered from a mental illness, but as long as he did not use drugs or alcohol he was not dangerous. Dr. Eshkenazi diagnosed S. as suffering from bipolar disorder and drug and alcohol abuse. According to the doctor, at the time of the evaluation the only current signs and symptoms of S.'s mental illness were fast speech and slight elation, and he concluded that S.'s bipolar disorder was in remission. He added, however, that with bipolar disorder there will be a period of time, three or four months, where the person appears "normal", i.e., not elated or depressed. Dr. Eshkenazi also noted that the substance abuse was in remission, but conceded that S.'s confinement in the hospital most probably accounted for this condition.

On October 13, 1992, Doctor Nels K. Langsten, a private psychiatrist affiliated with the outpatient psychiatric clinic at Metropolitan Hospital, and an assistant professor of psychiatry at New York Medical College, who was hired by S.'s girlfriend, Colleen Bruck, interviewed S. for an hour and a half for the purpose of testifying in this matter. Dr. Langsten had first met S. in February of 1991, when he was working at the walk-in clinic at Metropolitan Hospital, and saw him three times during a period of one and one-half years. During that period, the respondent missed appointments, cancelled rescheduled appointments, and was "not compliant." The doctor did not review any of S.'s medical records in making his evaluation, and did not talk to Dr. Cruz or Dr. Ibanez. In addition, the doctor did not know the extent or the details of S.'s criminal record.

Dr. Langsten noted, in connection with his evaluation, that S. displayed restless, pressured, rapid speech, and a hypomanic mood, i.e., a mild mania. He conceded that S. could suffer from more severe manic episodes while under the influence of alcohol. Dr. Langsten concluded that S. suffered

from a milder version of bipolar disorder, cyclothymia, a condition that involved mood instability, changes in moods between hypomania and depression but no psychotic episodes. He also found that S. suffered from alcohol dependence and polysubstance abuse, attention deficit, and antisocial and narcissistic personality disorders. Dr. Langsten concluded that while S. was mentally ill, he was not dangerous.

Doctor Michael Welner, an attending physician at Bellevue, also hired by Ms. Bruck, interviewed S. for 90 minutes on December 8, 1992. Dr. Welner concluded that S. suffered from attention deficit hyperactivity disorder, alcohol dependence, polysubstance abuse and narcissistic and antisocial personality disorders, but not bipolar disorder because of S.'s history of persistent overactivity, persistent high level of energy and the fact that there was no evidence of a manic pole or depressed pole. Dr. Welner viewed S.'s problem solely as diminished attention in that he had an inability to complete tasks because he is distracted by external stimuli.

All three doctors agreed that S. did not exhibit any signs of psychotic behavior, namely, hallucinations, delusions, looseness of association or flight of ideas; and all noted that his judgment and insight were good. While all three doctors found that S. suffered from long-standing mental illnesses of various types, and the abuse of drugs and alcohol, which caused him to commit crimes, all agreed that if S. were to refrain from using drugs and alcohol he would not be dangerous to himself or others. Not surprisingly, none of the doctors could predict S.'s compliance with such abstention; according to Dr. Eshkenazi, one needed to "hope and pray" that S. followed the rules.

At the conclusion of the hearing, Justice Miller found that S. was mentally ill and had violated his order of conditions as he had repeatedly done in the past. Based on his history, the Court found that it was "highly likely" that when released, S. would continue his uncontrollable behavior outside of a hospital setting and would simply not comply with any treatment plan, but rather would relapse into drug and alcohol abuse. Justice Miller acknowledged that S.'s behavior had been controlled during his hospital stay, but she explained:

"Mr. S. is a master of manipulation. He uses the criminal system to his benefit, so he has spent relatively little time in jail in spite of his 26 arrests. In the hospital, because he wants to get out, and also because he is in a structured environment, his behavior is more controlled. * * * Based on his history,

the Court also finds it is highly likely that whenever Mr. S. is released from the hospital, he will get into trouble again, for the following reasons: He violated the order of conditions this time, as he has violated the order of conditions in the past, because he does not accept them fully. He cannot accept limits.

"His outbursts in the courtroom diminished because of the structured hospital setting, and because he is regularly taking Cylert. But when he's outside the hospital, the patient does not take medication regularly. Reasonable requests to have him move on have resulted in him defying police officers, bartenders, restaurant employees, etc. Although the patient stated that alcohol and drugs plagued him for years, he is not consistent in his treatment. Based on his past history, he will not commit himself to the A.A. program totally and with sufficient regularity for success.

"The patient is verbally provocative, even with his fiance. He cannot control himself to refrain from escalating incidents. Such behavior has led to his numerous arrests. He never learns from his past experience. As I indicated, the patient has violated his order of conditions. He has constantly moved from program to program. This is what he has done in the past. He never stays at any one program and complies with it 100 percent, so that progress can be made. He never moves from square one. And if he's released from the hospital he probably will continue that same behavior. However, the law does not permit me to confine Mr. S. to a secure hospital, because he is not currently dangerous.

"Yet based on his limitations and his past history, it is highly likely that if he is released he will not attend A.A. regularly, he will not continue to take Cylert, even though he's benefited by it, he will not stop provoking people, he will not accept lawful authority, he will not respect the rights of others; because he considers that he alone is the ultimate judge of what is proper and reasonable behavior."

Nevertheless, relying on *Matter of Torres (People)* (166 AD2d 228, *aff'd for reasons stated* 78 NY2d 1085, *supra)* the court "reluctantly" held that the Commissioner failed to demonstrate that S. suffered from a dangerous mental disorder. Justice Miller's ruling was incorrect, in our view, since there was ample evidence that S. suffered from such a disorder. Consequently, the order appealed from should be reversed, the application granted and S. confined to a secure psychiatric institution.

At the outset, there is very little support in the record for Justice Miller's conclusion that S. was mentally ill but did not suffer from a dangerous mental disorder. Under CPL 330.20 (1) (c), a defendant suffers from such a disorder if he currently suffers from a mental illness, as defined in Mental Hygiene Law § 1.03 (20), and because of that condition, currently constitutes a physical danger to himself or others. Here, there is no dispute that S. was mentally ill; six psychiatrists who testified at the hearing all concurred in that conclusion. In addition, after hearing the evidence, Justice Miller found, as a matter of fact, that once released, respondent would revert to his prior pattern of behavior, a pattern which included the abuse of drugs and alcohol, a failure to comply with treatment and substance-driven violent behavior characterized by his defiance of authority figures.

Medical support for Justice Miller's conclusion that S. would revert to drug and alcohol use outside of the facility was offered by three psychiatrists who testified on behalf of the State. All agreed that until respondent acknowledges his mental illness and abstains from drug and alcohol abuse he will continue to have a dangerous mental disorder. Moreover, while S.'s psychiatrists disagreed that he would revert to his prior behavior, they agreed that if he began abusing drugs and alcohol again he would revert to his dangerous behavior. Notably, S. acknowledged that his criminal record was due to his dependency on drugs and alcohol, and that he "slipped" several times since his release from South Beach in 1990, i.e., he began drinking on those occasions. In short, Justice Miller had little doubt on this record that S. would revert to the very behavior that the State's psychiatrists characterized as demonstrating a dangerous mental disorder.

Despite the absence of any support in the record for the conclusion that respondent was merely mentally ill, and Justice Miller's finding a strong probability of his reversion to a dangerous state, she nevertheless denied the recommitment application. In doing so, she interpreted *Matter of Torres (supra)* to mean that when a CPL 330.20 defendant's external behavior improves because of the structured setting in which he is confined, he is not dangerously mentally ill under CPL 330.20 (1) (c) even though it is "highly likely" that he will revert to his dangerous behavior outside the structured environment. That is not the holding of *Torres.*

In *Torres (supra),* the defendant had been found not respon-

sible for murder by reason of mental disease or defect and had been confined to a secure psychiatric hospital for 10 years. Following drug treatment, his psychiatrist recommended that he be transferred from a secure facility to a nonsecure hospital. At the transfer hearing, the treating physician changed his recommendation and opined that Torres would eventually discontinue his medication and suffer a relapse rendering him a dangerous person. The hearing court, nevertheless, found pursuant to CPL 330.20 (1) (c) that since Torres did not presently constitute a physical danger to himself or others, he was not suffering from a "dangerous mental disorder" and could no longer be retained in a secure facility. The majority of this Court agreed with that conclusion and thus affirmed the hearing court's determination requiring transfer to a nonsecure facility which would still monitor his medication. The Court of Appeals affirmed this determination. Unlike Torres, S. has demonstrated over and over again that upon release from a controlled environment, he will resort to drugs, alcohol and dangerous behavior. S.'s history presents an undeniable pattern which distinguishes this case from *Torres* and compels the conclusion, by a preponderance of the evidence, that S. is currently suffering from a dangerous mental disorder, as testified to by the State psychiatrists, since he will inevitably resort to assaultive or other dangerous behavior upon his release from a controlled environment.

Recently, the Appellate Division, Second Department, was confronted with a similar situation in the context of a civil commitment hearing (Mental Hygiene Law § 9.31) which required a finding of dangerous mental disorder by clear and convincing evidence *(Matter of Seltzer v Hogue,* 187 AD2d 230). Hogue, like S., had a history of polysubstance abuse and mental illness. Invariably, following release from psychiatric hospitals, Hogue would recommence his use of alcohol and illegal drugs, stop taking medication and engage in violent and uncontrollable behavior. Whenever he was recommitted, just like S., his behavior would become nonviolent, and thus the trial court denied Hogue's involuntary commitment because at the time of the hearing, he was no longer a danger to himself or to others. However, the Second Department unanimously reversed and granted the application for retention, specifically finding that "although Hogue's external behavior has improved somewhat in Creedmoor (a structured setting in which he takes certain seizure medication), he has a history of noncompliance with any treatment program upon his release

from psychiatric hospitals. Indeed, once he is released from these institutions, his mental illness invariably deteriorates to the point that he engages in substance abuse and activities which are dangerous to himself and others." *(Supra,* at 237-238.) These words can aptly be applied to S. We accordingly conclude that the appellants have demonstrated by a preponderance of the evidence that S. suffers presently from a dangerous mental disorder, and therefore the recommitment application should be granted.

We find no merit to S.'s argument that since he was originally found to be mentally ill but not suffering from a dangerous mental disorder, following his plea of not responsible by reason of mental disease or defect, he may not be recommitted pursuant to CPL 330.20 (14) which requires a finding of dangerous mental disorder by a preponderance of the evidence, but, instead should be treated like a civil committee which requires a finding of dangerousness by clear and convincing evidence. That argument was specifically rejected by the Court of Appeals as a matter of statutory construction *(People v Stone,* 73 NY2d 296, 299-300) and by the Appellate Division, Second Department, under constitutional due process and equal protection standards *(Matter of Zamichow [New York State Commr. of Mental Health],* 176 AD2d 807, *appeal dismissed sub nom. Matter of Lloyd Z.,* 79 NY2d 851). In any event, even if the clear and convincing evidence test were deemed applicable to the instant proceeding, we would find that the evidence at the hearing met that more stringent test.

*Foucha v Louisiana* (504 US —, 112 S Ct 1780) does not support the dissenter's contention that S.'s due process rights were violated. In *Foucha,* the State retained the defendant in a psychiatric facility merely because he was dangerous; but clearly, confinement in a psychiatric facility is unjustifiable once the acquittee regains his sanity. As the Supreme Court observed (504 US, *supra,* at —, 112 S Ct, *supra,* at 1784): "In this case, Louisiana does not contend that Foucha was mentally ill at the time of the trial court's hearing. Thus, the basis for holding Foucha in a psychiatric facility as an insanity acquittee has disappeared, and the State is no longer entitled to hold him on that basis." In the case at bar, the court stated: "The Court finds that the defendant is mentally ill. All the psychiatrists have testified that he is mentally ill." *Foucha* is thus readily distinguishable on its facts.

Nor do we find merit to S.'s claim that the proceeding to recommit him was untimely. The application for recommit-

ment was originally filed on August 4, 1992, within the five-year period of the order of conditions which commenced August 7, 1987, the date S. pleaded not responsible by reason of mental disease or defect. While these conditions were amended at one point, the amendment was made nunc pro tunc as of August 7, 1987. The application was filed with the court on August 4, 1992, and attempted service at S.'s last known address was made. However, it was later discovered that S. did not receive a copy of the recommitment application, and shortly thereafter a new notice of the recommitment application was sent to S. at his fiancée's residence in Baldwin, New York, where it was actually received by S.

CPL 330.20 (14) provides that "[a]t any time during the period covered by an order of conditions an application may be made by the commissioner or the district attorney to the court that issued such order * * * for a recommitment order when the applicant is of the view that the defendant has a dangerous mental disorder." The order of conditions did not expire until August 7, 1992, and the present application was filed on August 4, 1992. Therefore, it was timely. While CPL 330.20 (14) requires service of the application for recommitment on the defendant, it does not require that service on the defendant be made simultaneously and within the five-year term of the order of conditions. The failure to serve the recommitment application on S. within the five-year period was not a jurisdictional defect, and the State was properly permitted to hold the statutorily mandated hearing, especially where the recommitment application was made to the court within the period governing the order of conditions (see, People ex rel. Thorpe v Von Holden, 63 NY2d 546).

█ Finally, S. argues that the affidavit submitted in support of the recommitment application was insufficient and, therefore, the application should be dismissed. Specifically, S. argues that Dr. Castillo's clinical evaluation from 1990 was not representative of his clinical diagnosis at the time of the recommitment application, and that the basis for the doctor's determination that S. was dangerous was not based on personal knowledge. We disagree. CPL 330.20 (20) requires that all applications pursuant to CPL 330.20 be supported with an affidavit of at least one psychiatrist which sets forth the defendant's clinical diagnosis, a detailed analysis of the defendant's mental condition and the opinion of the psychiatric examiner.

In his affidavit, Dr. Castillo stated that S.'s clinical diagnosis

in 1990 was bipolar disorder, manic type, and that based on a review of S.'s inpatient psychiatric care, his history of non-compliance with his order of conditions and two recent arrests —affidavits of both Assistant District Attorneys were provided —he concluded that respondent constituted a danger to himself or others and required care and treatment in a secure psychiatric facility. We find that the affidavit was sufficient to satisfy the statute's requirements, particularly since the Commissioner had lost contact with S. upon his release from South Beach in 1990, and was, thereby, unable to submit a more updated clinical analysis.

In any event, the alleged insufficiency of the allegations in the affidavit submitted in support of the recommitment application are not jurisdictional defects, but rather would be pertinent only to a motion to dismiss the proceeding or a habeas corpus petition prior to hearings (see, CPL 330.20 [20]). We perceive this as analogous to a motion to dismiss an indictment on the ground that the "evidence before the grand jury was not legally sufficient to establish the offense charged." (CPL 210.20 [1] [b].) The Criminal Procedure Law provides in this respect: "The validity of an order denying any motion made pursuant to this section [to dismiss an indictment for insufficiency] is not reviewable upon an appeal from an ensuing judgment of conviction based upon legally sufficient trial evidence" (CPL 210.30 [6]). By analogy, there seems little point in concentrating our attention upon the technical sufficiency of the affidavit, upon which the recommitment proceeding was commenced, after extensive hearings generating over 1,500 pages of mostly psychiatric testimony, in the course of which 1,800 pages of S.'s psychiatric records were admitted into evidence, explored and tested. The question before us is whether or not the evidence at the hearing established that S. had a dangerous mental disorder (CPL 330.20 [14]) as defined by CPL 330.20 (1) (c). We have concluded that the evidence at the hearing established that S. did suffer from a dangerous mental disorder.

The order of the Supreme Court, New York County (Edith Miller, J.), entered February 1, 1993, which denied the appellants' application seeking recommitment of respondent Francis S., also known as Francis S., pursuant to CPL 330.20 (14), should be reversed, on the law and on the facts, and the application should be granted.

MURPHY, P. J. (dissenting). Appellants, the New York

County District Attorney and the Commissioner of the New York State Office of Mental Health (hereinafter Commissioner or OMH), appeal from an order of the Supreme Court, New York County, which, after a hearing, denied the Commissioner's application to recommit respondent Francis S. as dangerously mentally ill pursuant to CPL 330.20 (14). Appellants' principal contention is that the hearing court misconstrued the statutory standard for recommitment, and that had the applicable standard been properly understood, the hearing evidence evaluated in its light would have required respondent's recommitment. In his reply, respondent, in addition to arguing the contrary proposition, i.e., that the result reached by the hearing court on the merits was correct, has answered, as he is doubtless entitled to (see, CPLR 5501 [a] [1]), with two contentions, fully preserved in the record, challenging the court's basic authority to recommit him pursuant to CPL 330.20. One of these challenges supposes the statute's constitutionality, the other does not.

As I believe all three of respondent's principal points possess merit, I find it necessary to dissent from the majority's determination to reverse the appealed order and grant the application for recommitment.

While I believe that the facts relevant to the proper disposition of this matter are relatively simple, the possibility that this matter will ultimately be decided on the basis of the hearing evidence requires a more extended factual exposition.

The present recommitment proceeding arises out of events dating back to October of 1983. At that time, respondent was arrested and charged with attempted assault in the first degree and criminal possession of a weapon in the third degree. After being arraigned on the charges, respondent was released on his own recognizance and some seven months later, in May 1984, while the New York charges were still pending, was arrested for larceny-related offenses in New Jersey. He was subsequently psychiatrically hospitalized in New Jersey, having been found incompetent to stand trial on the New Jersey charges, and remained in New Jersey at Greystone Psychiatric Center for nearly two years. While at Greystone, respondent was diagnosed as a schizophrenic and accordingly treated with large doses of antipsychotic medication.[1] In April 1986, respondent was discharged from Grey-

---

1. It should be noted that not one of the six psychiatrists testifying at

stone and extradited back to New York for prosecution upon the pending assault and weapons possession charges; the New Jersey charges were dismissed.

In June of 1987, respondent pleaded not guilty to the New York charges, premising his claim of innocence on grounds of mental disease or defect. He was, thereafter, remanded to Kirby Forensic Psychiatric Center where he was examined by two forensic psychiatric experts. These doctors diagnosed respondent as suffering from bipolar disorder and indicated that he should be treated with lithium. The doctors agreed that although respondent was mentally ill he did not suffer from a dangerous mental disorder.

On August 7, 1987, respondent's not responsible plea was accepted and the charges were dismissed. On the same date a hearing was held pursuant to CPL 330.20 (6) to determine respondent's disposition as an insanity acquittee. Following the hearing, the court, in accordance with the aforementioned opinions of the two examining psychiatrists, found respondent mentally ill, but not dangerously so, and remanded respondent to the custody of the State Commissioner of Mental Health pursuant to CPL 330.20 (7) to be committed as a civil patient *(ibid.)* for a period of four months. Issued along with the civil commitment order was an order of conditions *(see,* CPL 330.20 [7]), valid for a five-year period *(see,* CPL 330.20 [1] [o]), requiring simply that the respondent comply with his treatment plan and that he not leave any facility to which he was confined while in the Commissioner's custody without authorization *(ibid.).*[2]

Pursuant to the civil commitment order, respondent was hospitalized at South Beach Psychiatric Center. He was discharged from South Beach in December 1987 with plans to receive follow-up care at the Coney Island/Sheepshead Bay outpatient clinic.

In May of 1988, the Commissioner filed a recommitment application, alleging that respondent had not been compliant with treatment. The application, however, appears to have been withdrawn notwithstanding the June and July 1988

---

respondent's recommitment hearing concurred in the Greystone diagnosis of schizophrenia.

2. These are the standard conditions required by statute to be included in an order of conditions (CPL 330.20 [1] [o]). These conditions were not at the time supplemented with any additional provisions designed to address respondent's particular needs and circumstances.

arrests to which the majority and the People refer and which are said to have occurred during the application's pendency.

Following the arrests of June and July 1988, there is no record of any proven or for that matter alleged illegal conduct by respondent until the Canastel's incident some 17 months later. That incident, in November of 1989 (see, majority opn, at 8), resulted in a plea by respondent to assault in the third degree and a jail term of 30 days. Shortly after the Canastel's incident, on December 3, 1989 and December 13, 1989, respectively, there occurred two additional incidents, also at bars (see, majority opn, at 9), for which respondent was convicted, upon his plea[3] of guilty, of criminal mischief and sentenced to a jail term of 90 days.

A second application to recommit respondent pursuant to CPL 330.20 (14) as dangerously mentally ill was filed by the Commissioner in January 1990. In July 1990, however, after a hearing, the application was denied, the court finding on the basis of the psychiatric testimony that although respondent was mentally ill he did not suffer from a dangerous mental disorder.[4] In addition to again remanding respondent to the custody of the Commissioner for treatment at a nonsecure facility, the hearing court amended the outstanding order of conditions dating from August 7, 1987, to require, among other things, that respondent abstain from using alcohol and nonprescribed controlled substances.

From July until November 1990, respondent was rehospitalized as a civil patient at South Beach Psychiatric Center. As in his previous hospitalization there, he was diagnosed as a bipolar and treated with lithium. Upon his discharge, respondent went upstate where it was understood that he would live with family members in LeRoy, New York, and receive outpatient treatment at the Genesee Mental Health Center in Batavia. The record is uncontradicted that on November 16, 1990, just four days after his November 12 discharge from South Beach Psychiatric Center, respondent attended the Genesee Mental Health Center and that he kept two subse-

---

3. Both incidents appear to have been covered by this plea.

4. The court-appointed independent psychiatric expert, Dr. Azariah Eshkenazi, stated in his report to the court dated March 23, 1990, "once Mr. S. is stabilized on Lithium, he could comfortably be transferred to a less secure facility, since he does not represent any danger to himself or others as a result of his mental condition." This was a conclusion in which Dr. Ahmed Hakki of the Kirby Forensic Psychiatric Center came to concur. The court's determination to deny the application was thus well supported.

quent appointments on November 28, 1990 and December 4, 1990. Thereafter, respondent advised Ms. Rossi, a mental health clinical therapist at the Genesee clinic that he had decided to return to New York City, and did so in mid-December. It is clear that the Office of Mental Health was advised by Ms. Rossi of respondent's move and that contrary to the State's representation on this appeal OMH was also advised that respondent would be residing with his brother.[5]

On returning to New York City, respondent initially attended the Coney Island/Sheepshead Bay Outpatient Clinic but, dissatisfied with the treatment there, in February 1991 consulted Dr. Nels K. Langsten, the Associate Director of the Metropolitan Hospital outpatient department. Respondent informed Dr. Langsten of the outstanding order of conditions and Dr. Langsten, in turn, ascertained that it would be consistent with the order of conditions for respondent to be treated at the Metropolitan outpatient clinic. Thereafter, respondent was seen by Dr. Langsten and another psychiatrist associated with the Metropolitan clinic at varying intervals over the 17-month period preceding his hospitalization in connection with the within recommitment proceeding. Langsten testified at the hearing held upon the instant application, that when respondent first consulted him in February of 1991, he was taking Tegretol, a medication for the treatment of bipolar illness; the medication, however, had been prescribed by the Genesee clinic in a subtherapeutic dosage, and, in any case, was not in Dr. Langsten's opinion indicated as respondent did not fit the diagnostic criteria for bipolar illness. Langsten, accordingly, told respondent to discontinue the Tegretol. In Langsten's view, respondent suffered from attention deficit disorder and cyclothymia, an affective psychiatric disorder, but one of a significantly more mild sort than bipolar illness.

It was not until some six months after respondent's return to New York City and fully seven months after respondent's

---

5. Mr. Richard Miraglia, Assistant Director of the OMH Bureau of Forensic Services, in fact, submitted an affidavit in support of the within application for commitment in which he states: "13. Subsequently, the undersigned was informed by Ms. Rossi that Mr. S. a/k/a S. had relocated to the New York City Metropolitan Area and was reported to be living with his brother Gregory S. at 39 Ocean Avenue in Monmouth, New Jersey." Miraglia goes on to state that he sent a letter to respondent at his brother's address, dated February 4, 1991, indicating that respondent should continue his treatment at the Coney Island/Sheepshead Bay clinic.

November 1990 discharge from South Beach Psychiatric Center that respondent is reported to have again run afoul of the law. Detailed in the majority opinion *(supra,* at 10) are allegations pertaining to three incidents which occurred in June and July 1991. As noted by the majority, the charges arising from the New Jersey and Southampton incidents of June 17, 1991 and July 13, 1991, respectively, had still not been disposed of at the time of the respondent's recommitment hearing in January 1993, while the New York County charges, including those stemming from the July 6, 1992 incident, had been dismissed on the People's motion in order to facilitate respondent's delivery to the custody of the Commissioner for the within recommitment proceeding.

On August 4, 1992, just three days short of the expiration of the five-year order of conditions which had been in effect since August 7, 1987, the Commissioner purported to apply, yet again, for respondent's recommitment pursuant to CPL 330.20 (14). The boilerplate recommitment application was accompanied by a cover letter written by Harry C. Huguley, Mental Health Program Specialist, in which Huguley stated that respondent "is currently a patient of South Beach Psychiatric Center". Appended to the application as well was an affidavit of service executed by Huguley in which he averred that "[o]n the 4th day of August, 1992 [he] served [notice of the recommitment application] upon Francis S., c/o South Beach Psychiatric Center, 777 Seaview Avenue, Staten Island, New York." Remarkably, the application was also accompanied by an affidavit sworn to by Aristeo Castillo, M.D., a South Beach Psychiatric Center staff psychiatrist, in which Castillo averred that respondent's "last known address was 510 Harvard Avenue, Baldwin, New York." Castillo, of course, had supervised respondent's treatment during his last South Beach Psychiatric Center hospitalization which, as Castillo knew and the Commissioner should have known, ended in November 1990.

Castillo, in the balance of his affidavit, stated that he was familiar with respondent because he had last treated him a year and a half previously. He then set forth the following in support of the recommitment application:

"It is my opinion that the defendant's clinical diagnosis *at that time* [November 1990] was BI-POLAR DISORDER, MANIC TYPE.

"5.*[sic]* It is further my opinion, based on information and belief, that MR. S. (aka S., S.) *may presently* be suffering from

a dangerous mental disorder. I base this opinion on Mr. S.'S (aka S., S.):

"1) History of inpatient psychiatric care which dates to July 1, 1987 and includes admissions to Kirby Forensic, South Beach, and Buffalo Psychiatric Centers.

"2) Arrest on October 22, 1983 in New York City for Attempted Assault 1st Degree which resulted in a Plea of Not Responsible due to Mental Disease or Defect under NY County Indictment #8307-83.

"3) History of persistent non-compliance with the CPL 330.20 Order of Conditions issued subsequent to the above mentioned finding of Not Responsible Due to Mental Disease or Defect on August 7, 1987, and revised on July 5, 1990.

"4) Arrest on July 13, 1991 in South Hampton, New York. Annexed to this Affidavit entitled EXHIBIT I is a correspondence from Suffolk County Assistant District attorney Guy Arcidiacono attesting to the above mentioned outstanding criminal proceeding.

"5) Recent arrest on July 6, 1992 in New York, New York. Annexed to this affidavit entitled EXHIBIT II is a correspondence from New York County Assistant District Attorney Jennifer May Parker attesting to the above mentioned outstanding criminal proceeding.

"6) For the above stated reasons and based on information and belief it is my opinion that MR. S. (aka S., S.) presently constitutes a danger to himself or others and that he requires evaluation and treatment in a secure psychiatric center." (Emphasis supplied.)

When respondent, never having been served with notice of the recommitment application or with notice of Justice Parness's order dated August 7, 1992, directing him to appear in response to the application, failed to appear as directed, the Commissioner on August 26, 1992, requested issuance of a bench warrant. Justice Stecher, before whom the warrant application was brought, however, refused issuance of the warrant; as he noted, and as the Assistant Attorney-General was forced to concede, respondent had not been given the statutorily required notice either of the recommitment application or of the hearing scheduled to be held thereon.[6] Noting also that the recommitment application upon which the re-

---

6. CPL 330.20 (14) requires that a defendant be given written notice of a recommitment application and that he or she be served either personally or at his or her last known address with notice of the hearing to be held upon

quest for a warrant was predicated was in other respects defective,[7] Justice Stecher put the matter over in order to afford the Commissioner an opportunity to rectify the deficiencies. Accordingly, on August 28, 1992, the Commissioner submitted a revised recommitment application.

The revised recommitment application was made returnable on September 9, 1992, and notice of the application and the need to appear in connection therewith was mailed to respondent's last known address which, as Castillo had noted in his affidavit accompanying the original application, was 510 Harvard Avenue, Baldwin, New York. On September 8, 1992, however, respondent was arrested in connection with the Central Park incident recounted at some length by the majority (see, majority opn, supra, at 10-11) and when he did not appear on the September 9 return date, Judge Tompkins signed a warrant for his arrest. The warrant was executed the following day in Criminal Court immediately following the dismissal, on the People's motion, of the criminal charges relating to the July 6 and September 8 incidents. One week later, on September 17, respondent was produced pursuant to the warrant before Judge Lobis who signed an examination order specifically directing that respondent be psychiatrically evaluated at a nonsecure facility. Respondent was accordingly admitted, yet again, to South Beach Psychiatric Center. On October 21, 1992, however, respondent was transported to Kirby Forensic Psychiatric Center, a secure facility, purportedly to attend the recommitment hearing, and simply left there. Although a writ of habeas corpus was filed on November 2, 1992, challenging the transfer as violative of CPL 330.20 (14)[8] and respondent's constitutional right to be treated in the least restrictive environment (see, Matter of Kesselbrenner v Anonymous, 33 NY2d 161, 165), it was not until January 5, 1993, that the writ was finally decided in respondent's

the application. It is undisputed that neither requirement had been fulfilled at the time of the bench warrant application.

7. As the Assistant District Attorney stated at the recommitment hearing, "the judge did not sign the warrant, stating that Mr. Castillo's affidavit was insufficient due to hearsay."

8. CPL 330.20 (14) provides in relevant part, "[i]f the defendant fails to appear in court as directed, the court may issue a warrant to an appropriate peace officer directing him to take the defendant into custody and bring him before the court. In such circumstance, the court may direct that defendant be confined in an appropriate institution located near the place where the court sits" (emphasis added).

favor, the court finding pursuant to CPL 330.20 (14) that it was a judicial and not an administrative prerogative to place a defendant in an appropriate institution pending the completion of recommitment proceedings and that since there had been no judicial determination permitting respondent's transfer to a secure facility subsequent to Judge Lobis's order specifying that respondent be placed in a nonsecure facility, respondent's transfer to Kirby had not been legally accomplished.[9] Respondent was thus transferred back to South Beach where he remained until his release on February 4, 1993.

The recommitment hearing commenced before Judge Miller on November 18, 1992, and continued for six additional days over the course of December 1992 and January 1993. In all, 16 witnesses testified and their testimony is now spread out upon a record of over 1,400 pages. Although the length of the hearing was, in part, due to the fact that six psychiatric experts testified, it was also due to the circumstance that the focus of the hearing, purportedly held to determine whether respondent then had a dangerous mental disorder,[10] was permitted to become remarkably diffuse. Indeed, both the People and the Attorney-General were given extraordinary latitude to conduct in often duplicative fashion what amounted to a series of minitrials respecting conduct of the respondent much of which was remote in time and which, moreover, even if reliably proven was never competently attributed to any underlying dangerous mental disorder, much less one from which respondent currently suffered.

The relevance of the evidence of respondent's prior bad acts depended in the final analysis upon the extent to which there was psychiatric testimony establishing that respondent's antisocial behavior had, in fact, been caused by a persisting and clinically manifest mental illness.[11] With this in mind it would

---

9. It does not appear that this determination was appealed by the Commissioner.

10. CPL 330.20 (1) (c) states: " 'Dangerous mental disorder' means: (i) that a defendant *currently* suffers from a 'mental illness' as that term is defined in subdivision twenty of section 1.03 of the mental hygiene law, and (ii) that because of such condition he *currently* constitutes a physical danger to himself or others" (emphasis added).

11. The applicable definition of "mental illness" is "an affliction with a mental disease or mental condition *which is manifested by a disorder or disturbance in behavior, feeling, thinking, or judgment* to such an extent that the person afflicted requires care, treatment and rehabilitiation" (Mental Hygiene Law § 1.03 [20]; emphasis supplied).

be well to consider closely the nature and quality of the psychiatric testimony adduced at the recommitment hearing.

Dr. Delfin Ibanez, a staff psychiatrist at South Beach Psychiatric Center, was the first psychiatric expert to testify in support of the Commissioner's recommitment application.[12] Although respondent had by the time of Ibanez's testimony spent about one month on Ibanez's unit at South Beach, Ibanez testified that he had examined him on only three or four occasions for a total of about two hours. He appeared to have little or no independent recollection of respondent or his history and much of his direct testimony consisted of responding to leading questions and reading large portions of the hospital record verbatim. In any case, Ibanez diagnosed respondent as suffering from bipolar disorder, substance and alcohol abuse and an antisocial personality disorder. He indicated that lithium and Prolixin, the latter a potent antipsychotic medication, had been prescribed for respondent, but that respondent had not been compliant with taking the Prolixin. Although he had no direct knowledge of respondent's history of antisocial behavior or access to any clinical assessments reasonably contemporaneous with that behavior, Ibanez had no difficulty characterizing respondent's conduct in each of the many incidents described to him by the Assistant District Attorney as symptomatic of bipolar mental illness. Ibanez acknowledged that respondent had not been a behavior problem in the hospital, indeed, during his entire South Beach hospitalization there had been no manifestation of any dangerous mental disorder and, moreover, that at the time of the hearing he was completely asymptomatic. He indicated, however, that he, nevertheless, believed respondent to be dangerously mentally ill because "the moment he goes to the outpatient, he would stop follow-up" and thereafter engage in antisocial activity. While expressing this opinion, Ibanez had no recollection as to whether he had, and quite plainly had not, contacted respondent's outpatient psychiatrist to ascertain whether respondent had complied with outpatient treatment recommendations.

Dr. Robert Poundstone, a staff psychiatrist at Kirby Foren-

---

12. Contrary to the District Attorney's representation, there is no indication in the record that Ibanez was board certified. The only expert qualifications of record are that Ibanez obtained his medical degree from Far Eastern University in the Phillipines and then completed a residency in psychiatry in this country.

sic Psychiatric Center who had treated respondent from the time of his illegal transfer to Kirby on October 21, 1992, until his court-ordered return to South Beach on January 5, 1993, also testified in support of recommitment. Although he initially concurred in the diagnosis of bipolar disorder which respondent had carried during all of his South Beach hospitalizations, and gave testimony purporting to connect respondent's antisocial activity to that illness, it is clear that Poundstone had reservations. He stated, "It's conceivable [that S. does not suffer from bipolar illness]. The times that I have known of when he was psychotic seemed to be coincident with his use of alcohol and drugs. I have not come across a description of a manic episode that I would call a pure manic episode." Question as to the validity of the bipolar diagnosis was also raised by Poundstone's review of respondent's medical records, for they showed that respondent had not been responsive to lithium, the first-line chemotherapy for manic-depressive illness.[13] Given the demonstrated inefficacy of lithium in treating respondent, Poundstone had not continued respondent on the drug. Also discontinued by Poundstone was the other major psychopharmacological component of respondent's treatment at South Beach, the antipsychotic drug, Prolixin; as Poundstone did not consider respondent to be psychotic, use of the drug was, in his view, contraindicated.[14] Indeed, the only psychopharmacologic medication Poundstone thought appropriate to prescribe for respondent was Cylert, a drug sometimes used for the treatment of attention deficit disorder, a disorder from which it was, in Poundstone's view, clear that respondent had suffered since childhood. In addition to the attention deficit disorder diagnosis, Poundstone diagnosed respondent as an antisocial personality and made prominent diagnostic note of respondent's history of alcohol and substance abuse.

Poundstone, whose initial testimony took place on December 16, 1992, was recalled on January 15, 1993, this time as respondent's witness.[15] By the time of his recall, Poundstone had had the opportunity to observe respondent at Kirby for

---

13. Poundstone stated, "after reviewing some of the material that came in later from other hospitals, it appeared that lithium had never done him [respondent] much good."

14. He stated that it was an exercise of good medical judgment not to administer the drug.

15. His testimony on this latter occasion is nowhere even alluded to by the majority.

approximately three additional weeks.[16] It is clear that Pound-stone's doubts as to whether respondent did, in fact, suffer from bipolar illness had deepened since his previous testimony, and that he had come to believe that respondent's probable primary diagnosis was simply one of attention deficit disorder. In this regard he stated, "I have never seen him psychotic, and from his history the only times that I know of that he has been psychotic is when he has been involved with the law, admitted to the hospital, and we have some pretty good documented data. All of these instances appear to have been related to drug and alcohol abuse." Thus, Poundstone indicated that, although respondent under the influence of alcohol and drugs may have displayed symptoms grossly mimicking those of bipolar illness, it now seemed more probable that those symptoms were attributable to alcohol and substance abuse by a person whose capacity for benign consumption was very low, rather than to underlying manic-depressive illness. Lending further support to a primary diagnosis of attention deficit disorder was respondent's improvement while on Cylert. Poundstone noted that since beginning on Cylert during the second week in December, respondent, having complied with the medication regimen without protest, had become quieter and less argumentative; he had, according to Poundstone, become appropriately concerned about his situation and had gained some measure of insight respecting his illness.

Although Poundstone acknowledged that it would be unusual to commit someone involuntarily to a secure facility for the treatment of attention deficit disorder,[17] and that respondent could obtain the medication appropriate to the treatment of that disorder on an outpatient basis; and further acknowledged that respondent was not psychotic and had not behaved dangerously while in the hospital having in fact been a compliant patient, he nevertheless supported recommitment because "there are some people who, irrespective of the question of dangerousness, cannot be brought to accept treatment until they realize that they must, in order to achieve a discharge from the hospital." This rationale for involuntary

---

16. It will be recalled that respondent was not returned to South Beach until subsequent to the disposition of his habeas corpus petition on January 5, 1993.

17. He acknowledged that no one else on his service had been hospitalized by reason of that disorder.

hospitalization, Poundstone candidly acknowledged, was premised upon his judgment as to what he believed was medically in the patient's best interest, not the legally relevant assessment of present dangerousness. Having indicated that his judgment respecting the propriety of involuntary commitment had not turned upon respondent's dangerousness, or lack thereof, Poundstone quite naturally was asked what he understood to be the legal basis of the recommitment application he ostensibly supported. He replied "[t]hat he [respondent] will, unless treated in a secure facility, revert to dangerousness when he is outside of such residence."

Dr. Erazmo Cruz, director of the Structured Treatment Unit at South Beach Psychiatric Center,[18] was the final psychiatric expert to testify in support of recommitment. Cruz's testimony began inauspiciously with an improvised account of what had precipitated respondent's hospitalization; he was eventually forced to admit that he simply did not know.[19] This was not all that Dr. Cruz did not know. Cruz, it seems, had by his own admission not spent "that much" time with respondent, having met with him for only 45 minutes during his entire South Beach hospitalization;[20] Cruz explained that respondent's day-to-day care had been the responsibility of a "primary therapist", a Mr. Robert Sargeant, whom Cruz claimed to have consulted about respondent's progress twice daily.[21] In addition to having had relatively little direct clinical contact with respondent, Cruz apparently did not think it important to

18. Once again, contrary to the District Attorney's brief, there ·is no indication in the record that Dr. Cruz was board certified. Like Dr. Ibanez, Dr. Cruz attended medical school in the Philipines and thereafter completed his postgraduate medical training in this country.

19. Indeed, even after having been afforded the opportunity to refresh his recollection by referring to the account of the Central Park incident contained in the hospital record, Cruz was still unable to provide even a minimally accurate account of the incident, as reported. When the Assistant Attorney-General in an attempt to rehabilitate Cruz inquired, "Do you have any recollection now of the details of what was alleged that occurred in the park, what this man allegedly did? * * * Do you have the fact or details of what he was doing? If you don't, tell me you don't know." Cruz replied, "No, sir."

20. Dr. Poundstone, respondent's treating psychiatrist at Kirby Forensic Psychiatric Center, had, by contrast, felt it clinically appropriate to meet with respondent on a daily basis.

21. It may be noted that, notwithstanding the fact that Sargeant had apparently been entrusted with considerable responsibility for respondent's direct care, he was not an expert in psychiatry, psychology or social work and accordingly was not qualified as such.

review the records of respondent's previous hospitalizations,[22] or to consult with psychiatrists who had treated respondent on an inpatient or outpatient basis. He had not even taken the trouble to communicate with Dr. Poundstone, whose treatment of respondent at Kirby immediately preceded respondent's return to Cruz's unit at South Beach. Nor did Cruz see any need to contact Dr. Langsten who, as noted, had treated respondent as an outpatient for the 17 months immediately preceding his rehospitalization at South Beach. Cruz stated that he did not think it important to contact Langsten because he did not agree with Langsten's diagnosis.[23] Among other revealed gaps in Cruz's knowledge of respondent and his clinical history, was his ignorance of the fact that respondent, upon his 1990 discharge from South Beach, was initially to be followed at the Genesee clinic. Nor, although Cruz confidently claimed that it had been violated, was he aware of what was contained in respondent's order of conditions.

Notwithstanding these rather significant lacunae in his knowledge of respondent, his past treatment and response thereto, Cruz in September of 1992, diagnosed respondent as suffering from "bipolar disorder, manic type, psychotic". When asked to describe the signs and symptoms of the diagnosed illness, Cruz referred to respondent's sense of "exaggerated omnipotence". Also considered diagnostically relevant by Cruz was respondent's refusal to accept Cruz's diagnosis, his belief that he did not need to be in the hospital, and his unwillingness to accept antipsychotic medication.

Having so diagnosed respondent, Cruz proceeded, without reference to any even relatively contemporaneous clinical assessments,[24] to characterize the diverse antisocial conduct described to him by the Assistant District Attorney and Assistant Attorney-General as uniformly attributable to prolonged manic episodes. When inquiry was made as to the clinical

---

**22.** He did not even know, for example, that respondent had been hospitalized for a period of two years at Greystone Psychiatric Center.

**23.** Cruz testified: "He [respondent] told me himself that this doctor [Langsten] thought that he did not need medication, that he was not manic depressive, and I disagreed." Cruz was then asked, "You didn't think it was important to discuss that with his out-patient doctor?" to which he responded, "That's correct, because I disagreed with the diagnosis."

**24.** When asked whether he had reviewed respondent's hospital records over the preceding decade, Cruz stated, "I don't have to. As I said, its a phenomenology of an illness." When further pressed as to the clinical basis for his claim that respondent had been ill with bipolar disorder for at least 10 years, Cruz responded, "Psychiatric certainty tells me that."

basis for his certitude as to the nature of the underlying disorder and its symptomatology, the following remarkable exchange occurred:

"Q. Its your position that in every one of these arrests Mr. S. was in a psychotic manic episode.

"A [Cruz]. I give him the benefit of the doubt as a clinician.

"Q. As a psychiatrist, without having examined him at that time and without having any other psychiatrist examine him at that time you can within a reasonable degree of psychiatric certainty state that he was in a prolonged psychotic manic episode at the time of all those arrests?

"A. Yes. Because I'm on the side of the patient.

"Q. Could you explain that for me?

"A. That I feel for the patient, that he has an illness, that I'm going to determine as much as I can if this is due to a physical problem. If he committed a crime, I would give that credit to him."

Cruz's certitude as to the bipolar diagnosis was accompanied by a complete rejection of the attention deficit disorder diagnosis which Dr. Poundstone and each of the three psychiatrists testifying on respondent's behalf had deemed, at the very least, the more probably correct primary diagnosis. In this connection, Cruz apparently attached no importance to the fact that respondent had been consistently diagnosed since childhood as suffering from attention deficit disorder. Indeed, he stated that the pediatric diagnosis must have been wrong because respondent was too intelligent to have been afflicted since youth with that disorder. He explained:

"A. The hallmark of attention deficit disorder is attention span, meaning the patient is not able to maintain a sufficient amount of attention span to be able to make decisions on school, activities of daily living, etc.

"So this results in the patient not being able to be educated, and because of his attention deficit, being not intelligent or not being able to have average intelligence skills.

"Q. Doctor, again, why is this not applicable to this patient?

"A. Based on the history again, Mr. S. has been involved—to have a project published in Architectural Digest that includes a lot of mathematics, including calculus—a patient with attention deficit disorder will not be able to do that."[25]

---

25. The reference here is to what is referred to throughout the record as

Having thus ruled out the attention deficit disorder diagnosis, Cruz pronounced that respondent should have deteriorated rather than improved on Cylert, for while Cylert, a stimulant, is capable of producing a uniquely paradoxical, therapeutic effect in persons suffering from attention deficit disorder,[26] it can exacerbate manic symptomatology in persons who suffer, as Cruz believed respondent to, from bipolar illness. Yet, as noted, contrary to Dr. Cruz's pronouncement, Dr. Poundstone had observed a marked improvement in respondent's condition during his treatment with Cylert, a course of treatment which, it should be emphasized, occurred immediately prior to respondent's return to Dr. Cruz's unit; dismissive as he was of the attention deficit disorder diagnosis, Cruz apparently had not seen fit to inquire of Poundstone as to whether the recent administration of Cylert had had any perceived therapeutic effect.

Cruz's testimony as to the inefficacy, indeed potential harmfulness, of Cylert is hard enough to understand in light of the contrary clinical evidence available to him at the time he took the witness stand; it is, however, all but incomprehensible in light of the fact that even as Cruz testified, adamantly rejecting the attention deficit disorder diagnosis and criticizing the prescription of Cylert for respondent as contraindicated, respondent, while a patient on Cruz's own service, continued to

the "Pan Am project". Respondent had originated an idea to place an auditorium atop the Pan Am Building and it was undisputed that in pursuance of this concept respondent had arranged for the execution of an architectural rendering of the proposed facility by the architects Laszlo Kiss and Simon Ungers. The rendering appeared along with comments and criticisms from reviewing architects in an issue of Architectural Digest. Although respondent's demonstrably true claim of involvement with the Pan Am project is elsewhere in Cruz's testimony prominently characterized as delusional and symptomatic of his mental illness, it is in this local context apparently adduced as proof of respondent's superior intelligence. It would appear, however, that contrary to Cruz's premise, the superiority of respondent's intelligence was far from clear. Testing done at South Beach Psychiatric Center contained in the records of that institution—records to which Cruz undoubtedly had access but apparently did not trouble to consult—showed respondent to have an I.Q. of about 88, a figure placing him squarely in the "dull normal" range. It was, moreover, the case that, as would have been evident to Cruz if he had even glanced at the issue of Architectural Digest in which respondent's concept was rendered, the technical aspects of the rendering had been the work not of respondent but of the architects retained by respondent.

26. This is to say that, although pharmacologically a stimulant, Cylert has been observed actually to have a quieting effect in adults with attention deficit disorder.

carry an attention deficit disorder diagnosis and to be medicated for that disorder with Cylert. Indeed, on January 19, 1993, just four days after Cruz's testimony, the weekly psychiatric note in the South Beach hospital record states, "[H]e [respondent] has been manageable and congruent with unit management. He is only taking Cylert as started by Kirby Forensic Hospital secondary to diagnosis of ADHD [attention deficit hyperactivity disorder]." The ADHD diagnosis and Cylert medication regimen were maintained by the South Beach psychiatric staff until respondent's discharge in early February 1993.

Upon the centrally relevant issue of respondent's dangerousness, Cruz in his report to the court wrote, and in his testimony affirmed in substance, that "patient's degree of impulsivity continues to be extremely high. His current level of control is highly volatile, very unpredictable and definitely extremely lacking. Because of this, he is a constant danger to himself and others." He also stated that respondent required hospitalization in a secure facility because he was a "strong escape risk". Again, however, Cruz's views appear to have had little factual much less clinical basis. Dr. Cruz, like Dr. Ibanez before him, was unable to point to even one instance during respondent's South Beach hospitalization in which the "constantly dangerous" respondent had, in fact, engaged in any kind of dangerous activity. Indeed, as respondent's primary therapist, Mr. Sargeant, would testify, and as is in any case evident from the hospital record, respondent was accorded full unit privileges by the end of his second week at South Beach, and pursuant to that grant of privileges was entitled to visit designated unsupervised and nonsecure parts of the hospital and its grounds. It would be curious to suppose that these privileges, conferred by unanimous vote of the entire treatment team including, of course, Dr. Cruz, were granted to a constantly dangerous and escape-prone individual.

Respondent called as his first witness Dr. Azariah Eshkenazi. Dr. Eshkenazi, a diplomate of the American Board of Psychiatry and Neurology and an assistant professor of psychiatry at Mount Sinai School of Medicine, possessed considerable experience in forensic psychiatry and special expertise in the treatment of psychiatric patients with alcohol and substance abuse problems.[27] He was appointed by the court to act

27. During the Nixon presidency, Dr. Eshkenazi was appointed as a White House consultant on drug and alcohol abuse prevention.

as an independent psychiatric expert and in that capacity examined respondent and apprised the court of his findings. Contrary to the impression which might be gleaned from the People's brief, Dr. Eshkenazi's one-hour examination of respondent on November 6, 1992, was not the only occasion upon which he had evaluated respondent. Eshkenazi had examined respondent repeatedly in connection with the 1990 recommitment proceeding and thus, at the time of the 1992 proceeding, was already quite familiar with him and his clinical history.

Although Dr. Eshkenazi diagnosed respondent as suffering from bipolar disorder, he, like Poundstone, was by no means certain that that diagnosis was correct. He had not, on the occasion of any of his examinations of respondent, observed manic symptomatology and noted that respondent remained asymptomatic without the benefit of lithium carbonate, the first-line pharmacological treatment for manic-depressive illness. Conversely, a review of respondent's medical records indicated that when respondent had been tried on lithium carbonate he had not derived much, if any, benefit from it; lithium treatment would likely have been effective had the underlying problem been manic-depressive illness.[28] In any case, Eshkenazi was quite clear that even if respondent did harbor an underlying manic-depressive condition, his criminality had its source elsewhere, namely, in his abuse of alcohol and drugs. While acknowledging that respondent might become dangerous if he again abused alcohol and drugs, he was emphatic that that possibility alone did not constitute a sufficient ground for psychiatric hospitalization: "I hate to use psychiatric hospitals for jail, to put everybody in that might use drugs or alcohol. Usually what we do in a hospital is detoxify somebody from the alcohol or drugs, refer them to a drug program outside, and we do pray and hope that they do follow those rules." In the absence of any presently symptomatic major psychiatric disorder—and Eshkenazi's examination had revealed none—Eshkenazi was unequivocal that there existed no basis to hospitalize respondent, much less to do so upon the ground that he was dangerously mentally ill. When asked, "Is there any psychiatric basis for keeping him [respondent] in a psychiatric hospital now for his condition?", Eshkenazi replied, "No, sir."

---

**28.** The response rate to lithium carbonate among those who are afflicted with bipolar illness is about 70 per cent.

Also testifying in respondent's behalf was Dr. Nels K. Langsten who, as noted, was respondent's outpatient psychiatrist between February 1991 and his hospitalization in connection with the within recommitment proceeding. Although the People cavil at the hearing court's decision to qualify Dr. Langsten as a psychiatric expert, his qualifications were impeccable; he had practiced psychiatry for well over 20 years and at the time of the hearing was Associate Director of Metropolitan Hospital's outpatient psychiatry department. He was also an assistant professor of psychiatry at New York Medical College and in that capacity was responsible for supervising residents in the Metropolitan Hospital Psychiatric Emergency Room. Moreover, Langsten's testimony, which was the only hearing testimony actually probative of respondent's psychiatric condition as an outpatient, was of particular relevance in the context of a hearing in which the proponents of recommitment premised their claim of dangerousness upon what they sought, in reliance upon respondent's history, to portray as a strong likelihood of extrainstitutional psychiatric deterioration. Suffice it to say that if, as the People claimed, respondent's psychiatric condition had invariably deteriorated as an outpatient, much less to the point that he became dangerous due to prolonged manic episodes, so dramatic a change in respondent's mental status would likely have been detected by an examining psychiatrist, particularly by an experienced emergency room diagnostician such as Langsten following respondent over an extended period. Yet, Langsten stated that during the nearly one and one-half years respondent had attended the Metropolitan Hospital outpatient clinic he had never been observed to be psychotic, nor had he for any other psychiatric reason presented as a danger to himself or others. Indeed, respondent's condition had been so stable, psychiatrically speaking, that Langsten had seen no need to continue respondent on the medication he had been taking or to prescribe other medication in its place.

In declining to diagnose and treat respondent as a bipolar, Langsten noted that there was no evidence, either from his own examination or in respondent's history, that respondent had ever experienced a prolonged manic episode. Rather, Langsten believed respondent suffered from a much more mild affective disorder and from attention deficit hyperactivity disorder. Neither of those relatively benign disorders, however, could in Langsten's view account for the behavior leading to respondent's numerous legal entanglements. As had

Eshkenazi, Langsten attributed that behavior squarely to respondent's volitional abuse of alcohol and drugs and expressed the opinion that respondent's misconduct while intoxicated should not be dealt with primarily as a psychiatric problem, indeed that to do so would communicate to respondent the entirely unwarranted and ultimately counter therapeutic message that he was not responsible for his antisocial behavior. Langsten stated,

"I think he's responsible for his behavior and if he does things that are illegal he should be held responsible for that behavior, and I think it's compounded the problem that that hasn't happened, that he has been tangled up with the mental health system, so that somehow that is the alternative to him —if somebody harasses somebody or threatens somebody, that's illegal and they should be given whatever punishment.

"And that probably is as effective as anything else in eventually having somebody stop doing that. I think it makes it more of a problem that somebody gets sent to mental health and gets put in a hospital, not only that they have indeterminate lengths of stay that aren't necessarily determined by the offense, but also that in effect it puts him in a position where he is being told he is not responsible for the behavior."

The last of the psychiatric experts to testify in respondent's behalf was Dr. Michael Welner. At the time of his testimony, Welner, a specialist in forensic psychiatry, was an attending physician on one of Bellevue Hospital's prison wards and a member of the full-time faculty at the New York University School of Medicine. Citing the lack of any clinical evidence that respondent had ever suffered from prolonged manic episodes[29] and noting respondent's well-documented failure to respond to lithium, Welner rejected the bipolar diagnosis espoused by the proponents of recommitment. His examination of respondent and review of his psychiatric history led him, instead, to conclude that respondent suffered simply from

---

**29.** In this regard, Welner was careful to distinguish evidence gleaned from competent psychiatric examination from the various lay accounts of incidents in which respondent was alleged to have committed crimes. As to the latter sort of evidence, Welner stressed that it would not be possible to determine from such accounts alone whether the conduct described was attributable to acute psychiatric illness. Absent any relatively contemporaneous clinical evaluations such reports, if accurate, could, in Welner's view, be taken as indicative of no more than recidivist criminality, a phenomenon which, while perhaps reflective of serious personality problems, bears no necessary relation to any legally relevant psychiatric disorder.

attention deficit hyperactivity disorder, a disorder with which he had been diagnosed since childhood but for which he had not as an adult received specific treatment. Welner stated that while attention deficit hyperactivity disorder might render a person irritating or intrusive there was nothing particularly dangerous about its symptomatology and, indeed, that he had never seen a patient hospitalized for its treatment.[30] He indicated that the various pharmacotherapies for the disorder, among them Cylert, the drug prescribed for respondent and which respondent had been taking, were all easily available on an outpatient basis.

Regarding the conduct which had precipitated respondent's numerous arrests, Welner expressed the view that there was no basis to suppose that it was principally attributable to any underlying mental illness, particularly an illness as relatively innocuous as ADHD. There was, on the other hand, substantial evidence indicating that on the occasion of each cited incident respondent had been intoxicated. Welner stressed that respondent's intoxication was itself sufficient to account for his antisocial and on some occasions reportedly bizarre behavior and that there had been no connection shown between respondent's tendency toward drunken unruliness and any psychiatric illness. In this regard Welner testified: "I have no guarantee that if I'm intoxicated that I'm not dangerous, and I don't have attention deficit disorder, and I believe that's of significance. I think if anyone is intoxicated it's unrelated to a diagnosis of attention deficit disorder and they may or may not be dangerous."

As to the clinical propriety of an involuntary psychiatric hospitalization for intoxication, much less as a means of avoiding the possibly dangerous consequences of an intoxication whose occurrence was yet a hypothesis, Welner stated, "[Persons] are not hospitalized for alcohol abuse. Not only alcohol abuse, but not for alcohol dependence, let alone intoxication * * * it is a frequent occurrence in every emergency room across the country, including those in New York, that when someone is intoxicated and demonstrates the behavioral changes of intoxication, until the hospital treating personnel figure exactly whats going on, an individual is often brought

---

30. Indeed, Welner testified that even a voluntary psychiatric hospitalization for the treatment of ADHD would not have been appropriate. When asked, "If he [respondent] presented to an admitting room of a psychiatric hospital where you worked and asked to be admitted, would he be admitted, given his diagnosis [ADHD]?", Welner responded, "No".

to a hospital * * * and monitored. And then these symptoms clear and the individual is then discharged when it becomes clear that they are in fact intoxicated and this is what is producing behavioral changes."

On January 25, 1993, more than two months after the hearing had commenced and some five and one-half months after the filing of the application to recommit respondent for a period of six months, the hearing finally concluded with the court, citing the absence of the statutorily required proof that respondent was currently dangerous (see, CPL 330.20 [14]; [1] [c]), denying the recommitment application. In reaching this determination, the court relied on this Court's decision in *Matter of Torres (People)* (166 AD2d 228, *affd for reasons stated* 78 NY2d 1085), in which we had occasion to stress that within the context of CPL 330.20 a defendant may not be found to suffer from a "dangerous mental disorder" unless there is proof by a preponderance that he " 'currently consti-tutes a physical danger to himself or others' (CPL 330.20 [1] [c])" *(Matter of Torres [People], supra,* at 230; emphasis added).

Having ruled upon the legal question before her, the court went on with evident frustration to ventilate the opinion that "it is highly likely that whenever Mr. S. is released from the hospital, he will get into trouble again". Urging, in essence, that this expression of pessimism as to respondent's prospects as a free man was tantamount to the finding of current dangerousness expressly required by the statute, appellants now contend that they met their burden and that the recom-mitment application ought to have been granted. Before con-sidering, however, whether the statute's apparently rigorous substantive standard for recommitment may be read so laxly as to be satisfied by reservations of the sort expressed by the hearing court, it would be well to address respondent's juris-dictional and constitutional objections to the maintenance of the proceeding; plainly, there would exist no call for interpre-tation of the statute's substantive recommitment standards if their invocation was in the first instance either jurisidiction-ally or constitutionally invalid.

Respondent contends that the Commissioner's failure to serve him with written notice of the recommitment applica-tion within the period of the underlying order of conditions constituted a jurisdictional defect requiring dismissal of the application. The Commissioner and District Attorney respond that CPL 330.20 (14) requires no more than that the applica-

tion for recommitment be filed during the pendency of the order of conditions and that service of written notice of the application upon the defendant, although expressly required by the statute, need not be accomplished within the duration of the order of conditions as a jurisdictional prerequisite. It is the Commissioner's position then that once the recommitment application has been timely filed the statute's notice requirements may, thereafter, go unsatisfied for an indefinite period without impairing the court's authority ultimately to entertain the application once service upon the defendant has finally been made. This, in my view, is not a tenable understanding of what the statute may be held to require.

While it is, of course, true that CPL 330.20 (14) does not expressly require that notice of a recommitment application be served upon a defendant within any specified time period, it may be fairly inferred that the Legislature intended that a defendant be afforded notice of a recommitment application either prior to the filing of the application with the court or shortly thereafter and in any case with a degree of expedition appropriate to the nature of the applicant's underlying claim, namely, that there is a dangerously mentally ill individual at large in immediate need of recommitment at a secure psychiatric facility.

Notwithstanding the inevitable urgency of the claim made by an applicant for recommitment, it is plain as a matter of due process that until a defendant has been served with the required notice of the recommitment application, the court will be powerless to adjudicate whether the application should be granted. The mere filing of the recommitment application, then, unaccompanied by attention to the statutory notice requirements, amounts to little more than an idle gesture; it is by itself meaningless to secure the obvious statutory objective of a prompt determination of whether an individual allegedly dangerous by reason of mental illness should be recommitted. This being the case, it must be supposed that the Legislature, while omitting to specify a time frame within which service on the defendant was to be made, fully intended that it be made in close temporal proximity to the application or at all events with reasonable expedition. Indeed, the statute apparently assumes that service upon the defendant will be practically contemporaneous with the filing of the application for it requires the court "[u]pon receipt of such application" (CPL 330.20 [14]) to order the defendant's appearance for a hearing thereon. Obviously, it would be useless to order the

defendant to appear for a hearing respecting an application of which he had not been notified.

The utter inutility of filing a recommitment application with the court without also effecting the reasonably contemporaneous fulfillment of the statutory notice requirements was, of course, not lost upon the Commissioner, who despite his present arguments to the effect that it was entirely appropriate to serve the respondent at a time remote from the application's filing, did, in fact, represent to the court at the time of the instant recommitment application's filing that respondent had already been served. Of course, as was subsequently conceded, the Commissioner's representations that respondent had been served, and more particularly that he had been served at South Beach Psychiatric Center where he was a patient, were false; and it was not until August 28, 1992, three weeks after the expiration of respondent's order of conditions, that notice of the application and of the court order directing respondent's appearance in response thereto were finally mailed to respondent at his 510 Harvard Avenue address in Baldwin, New York.

The jurisdictional difficulty in this case arises not simply from the fact that the service upon the respondent was inexplicably delayed, but from the additional circumstance that it was delayed beyond the termination of the five-year order of conditions to which respondent was subject. In requiring that an application for recommitment be filed within the period of an outstanding order of conditions (see, CPL 330.20 [14]), the Legislature's purpose was not merely to place a limitation upon when a recommitment application could be filed but, by that device, effectively to assure that adjudication of the application would not be unreasonably delayed beyond the period covered by the order of conditions. As noted, the statute contemplates that once the application is filed with the court a hearing will be immediately scheduled and thus assumes that neither the scheduling of the hearing nor the statutorily required court order directing the defendant's appearance therefor will be rendered futile by the applicant's delay in complying with the statutory notice requirements. As the hearing is intended to follow closely upon the application and the application is to be filed prior to the termination of the applicable order of conditions, it follows that timely filing should, and was obviously intended to have the consequence of assuring that the application's adjudication would commence either within the five-year duration of the underlying order of

conditions or, if the application is made near its expiration, not unreasonably long thereafter. In thus attempting by means of limiting the period during which an application may be filed, in turn to place some meaningful limitation upon the period during which recommitment may be actually obtained, the Legislature was doubtless aware that the recommitment provisions of CPL 330.20 constitute an extraordinary means of compelling psychiatric institutionalization, constitutionally justified, if at all, by certain presumptions as to the continuing dangerousness of insanity acquittees, the validity and indeed legality of which grow increasingly tenuous with the passage of time, and, as will invariably be the case in the recommitment context, an intervening judicial determination that the defendant is no longer dangerously mentally ill. It is then critical that a recommitment hearing not be unduly delayed, and especially that it not be delayed, except for good cause, beyond the limitations period set forth in the statute. To read the statute differently, as do the People and the State, treating the event of filing as a kind of tolling of the limitations period indefinitely suspending the applicant's obligation to move the recommitment process forward to a hearing and determination, vitiates the public safety objectives of the legislation—i.e., the rapid institutionalization of insanity acquittees who, while at large, have become dangerously mentally ill—and renders an already constitutionally suspect recommitment scheme all the more susceptible to invalidation. Manifestly, the Legislature did not, in imposing a temporal limitation upon filing for recommitment, intend to create a mere technical condition to recommitment the satisfaction of which would forever after preserve the court's jurisdiction to entertain an application whenever the applicant chose to pursue it, but rather to place a real limitation on the power of the court to recommit a defendant pursuant to CPL 330.20 (14).

An order of conditions good for an initial period of five years may be extended for good cause shown for an additional five years (CPL 330.20 [1] [o]). However, once the order of conditions, never having been extended, has expired more than five years after an insanity acquittal and an even longer time subsequent to the conduct for which the acquittee was prosecuted, and, as noted, after an intervening finding that the defendant is no longer dangerously mentally ill, the justification for subjecting an insanity acquittee allegedly in need of inpatient psychiatric care to the extraordinary recommitment

procedures set forth in CPL 330.20 (14), as opposed to the civil commitment provisions of the Mental Hygiene Law otherwise applicable where involuntary psychiatric commitment is at issue, loses whatever force it may have had.

Unless we wish to countenance the obviously unacceptable eventuality that months or even years after the expiration of an order of conditions a defendant may be hailed into court to respond to an application seeking recommitment upon the allegation that at some point during the duration of the since expired order he or she suffered from a dangerous mental disorder, it would be well to recognize that the limitations period contained in the statute amounts to more than just a filing deadline; that viewed in the relevant constitutional context and taken in conjunction with the applicant's undoubted obligation diligently to prosecute its application it should function and be understood to impose some outer limit upon the time within which the power of the court to recommit pursuant to CPL 330.20 may be exercised.

There will, of course, be situations in which the determination of an application timely filed and diligently prosecuted will extend past the expiration of the applicable order of conditions and in such a case it is clear that the court's authority under the statute to entertain the application ought not to be affected. This, however, is not such a case. The present proceeding, which extended well beyond the expiration of the underlying order of conditions, was significantly and inexcusably delayed by the Commissioner's repeated failure properly to serve respondent in accordance with the statute. Although the majority insists that the Commissioner "attempted service at S.'s last known address" it is plain from the face of the application itself that nothing of the sort occurred. The recommitment application indicates quite clearly that respondent's last known address was 510 Harvard Avenue, Baldwin, New York. Indeed, as noted, the affidavit of Dr. Castillo, included as a necessary part of the recommitment application (see, CPL 330.20 [20]), states prominently in its third paragraph, "I submit this affidavit in support of the Commissioner's application for Recommitment pursuant to CPL 330.20 (14) of FRANCIS S. * * * *whose last known address was 510 Harvard Avenue, Baldwin, New York"* (emphasis added). The obvious availability of this address notwithstanding, no attempt was made to serve respondent there. Instead, the Commissioner purported to serve respondent at South Beach Psychiatric Center. Yet, as even a cursory examination

of OMH records would have indicated, respondent, contrary to the Commissioner's representation to the court at the time of the filing, was not a patient at South Beach and had not been one for the previous year and a half. OMH now seeks to excuse its evident failure even to attempt service upon respondent at his last known place of residence, by claiming somewhat elliptically that it had been unable to verify that respondent still resided there. The record, however, is notably silent as what attempts, if any, at verification were made. Indeed, there is every indication that a simple phone call would have sufficed since respondent did in fact reside at the aforementioned Harvard Avenue address along with his fiancée, Ms. Colleen Bruck. We are confronted then with a record giving the strongest indication that rather than make any effort to serve respondent at his last known address, much less to ascertain whether he still resided there, OMH was content to mail notice of its application to a treatment venue from which its personnel had discharged respondent a year and a half before. Remarkably, even after having been expressly directed by the court on August 7, 1992, to serve respondent at his last known address with the order requiring his appearance for the hearing upon the recommitment application,[31] OMH inexplicably persisted in purporting to effect service on respondent at South Beach Psychiatric Center. And, thereafter, although it should have been evident that respondent had not been afforded the notice to which he was entitled either of the application or the hearing, OMH, upon respondent's nonappearance on the return date, did not hesitate to move for issuance of a bench warrant.[32] It was only at this point, when pressed by Justice Stecher, before whom the warrant application had been brought, that counsel for OMH belatedly conceded that respondent had never been served in accordance with the statute or the court's August 7, 1992 order.

Given this record of gross indiligence in the performance of the applicant's basic notice obligations prerequisite to the

31. The court, of course, directed such service in accordance with CPL 330.20 (14) which provides in relevant part, "[s]uch order [the order directing the defendant's appearance for a hearing upon the recommitment application] may be in the form of a written notice, specifying the time and place of appearance, served personally upon the defendant, or mailed to his last known address, as the court may direct."

32. The warrant application was made pursuant to CPL 330.20 (14) which provides in relevant part: "If the defendant fails to appear in court *as directed,* the court may issue a warrant to an appropriate peace officer directing him to take the defendant into custody" (emphasis added).

commencement of the mandated hearing upon its application, and the resultant delay in the proceedings extending well beyond the period covered by the applicable order of conditions, I believe that the application ought to have been dismissed. When the authority of the court to recommit a defendant pursuant to CPL 330.20 (14) is sought to be exercised beyond the period of the applicable order of conditions it would seem to me, for the aforestated reasons, that the applicant must as a condition of maintaining the application discharge its statutory obligations precedent to the commencement of the hearing in a reasonably competent and expeditious manner. The alternative is to sanction the indefinite and possibly extremely lengthy displacement of the civil commitment laws by the recommitment provisions of CPL 330.20 upon nothing more than the applicant's compliance with the statutory filing requirement. It would be ironic, indeed, if a filing requirement so plainly intended to effect a limitation upon the period of the statute's application, were permitted to have precisely the opposite consequence.

Another ground upon which the court ought to have declined to entertain the application for respondent's recommitment was the Commissioner's failure to submit along with his application a legally sufficient psychiatric examiner's affidavit supportive of the relief requested. CPL 330.20 (20) provides that "[n]o application may be made by the commissioner under this section without an accompanying affidavit from at least one psychiatric examiner supportive of relief requested in the application." The availability of the relief requested in the instant recommitment application, and indeed in any such application, entails a showing by the applicant that the defendant suffers from a "dangerous mental disorder" (CPL 330.20 [14]), which is to say that the defendant *currently* suffers from a 'mental illness' as that term is defined in subdivision twenty of section 1.03 of the mental hygiene law,[33] and (ii) that because of such condition he *currently* constitutes a physical danger to himself or others" (CPL 330.20 [1] [c]; emphasis added). It must be supposed then that a psychiatric examiner's affidavit submitted in support of a recommitment application would provide some clinical basis for the conclu-

---

**33.** "Mental illness" is defined in the referred-to section of the Mental Hygiene Law as "an affliction with a mental disease or mental condition which is *manifested* by a disorder or disturbance in behavior, feeling, thinking, or judgment to such an extent that the person afflicted requires care, treatment and rehabilitation" (emphasis added).

sion that the defendant was at the time of the application currently mentally ill and currently dangerous because of that illness. Indeed, the statute is quite clear about the sort of information which must be included in a psychiatric examiner's affidavit: "Such affidavit shall set forth the defendant's clinical diagnosis, a detailed analysis of his or her mental condition which caused the psychiatric examiner to formulate an opinion, and the opinion of the psychiatric examiner with respect to defendant" (CPL 330.20 [20]). The statute is additionally explicit as to how an application unaccompanied by a sufficient affidavit is to be disposed of: "Any application submitted without the required affidavit shall be dismissed by the court" *(ibid.)*. It should be stressed that the statute provides no latitude for the exercise of discretion; once a supporting affidavit has been found deficient, the application must be dismissed. The contention, then, of the majority that the failure to include a sufficient supporting affidavit does not affect the court's jurisdiction is simply wrong. It is, to the contrary, obvious from the statutory language that the court may not entertain an application submitted without the required preliminary showing of clinical merit to the essential claim that the defendant currently suffers from a dangerous mental disorder.[34]

The affidavit of Dr. Castillo submitted in support of the instant recommitment application *(see, supra,* at 28-29) was plainly deficient. Completely absent from the affidavit was any reasonably current clinical information, much less any supportive of the applicant's essential claim that respondent currently suffered from a dangerous mental disorder. As Castillo acknowledged in the affidavit, he had not at the time of the affidavit's execution in August 1992 examined respondent for more than one and a half years, and thus was able to affirm only that, as of November of 1990, respondent had been diagnosed as suffering from bipolar disorder. Understandably, given his lack of any reasonably recent clinical contact with respondent, Castillo could not and consequently did not provide anything resembling the required "detailed analysis of

34. It should be noted also that, unlike CPL 210.20 which the majority finds pertinent but which expressly is not *(see, infra,* n 35), the obligation to dismiss an insufficiently supported CPL 330.20 application is placed squarely and exclusively on the court—no motion by the defendant is required. This is quite plainly because at issue is the basic authority of the court to adjudicate. By contrast, pursuant to CPL 210.20 the dismissal of an indictment must be "upon motion of the defendant" (CPL 210.10 [1]).

[respondent's] mental condition which caused [him] to formulate [his] opinion" (CPL 330.20 [20]), but opined instead "based on information and belief" that respondent "may presently be suffering from a dangerous mental disorder". Castillo's description of the "information" upon which his surmise that respondent might be dangerously mentally ill was based, consisted of a one-sentence allusion to respondent's history of inpatient psychiatric care; reference to the 1983 arrest resulting in respondent's insanity acquittal; an unelaborated assertion that respondent had been persistently noncompliant with his order of conditions; and reference to reports by New York and Suffolk County prosecutors indicating that respondent had been arrested twice in July 1992. Manifestly, the provision of this information was no substitute for the statutory requirement of a "detailed analysis" of respondent's mental condition. Indeed, if such a substitution were permissible, the requirement of a psychiatric examiner's affidavit could be dispensed with altogether, for clearly the affidavit of a qualified psychiatrist is not a necessary vehicle for the provision of second-, third- and fourth-hand information respecting a defendant's history of hospitalizations or arrests. Rather, the essential function of such an affidavit is to show a present clinical basis for the relief requested. That function is in no way fulfilled by the recitation of a diagnosis last confirmed by the affiant some 21 months before or by allusion to the defendant's history of psychiatric care and involvement with the criminal justice system. The inalterable circumstances of an insanity acquittee's past do not furnish a standing predicate for recommitment. Their possible relevance to the determination of such an application depends entirely upon whether the defendant currently suffers from a clinically manifest mental illness, something which, as the statute recognizes, can only be ascertained by psychiatric examination reasonably contemporaneous with the application. In this connection, it should be noted that the statute specifically requires that the affidavit supporting the application be executed by a "psychiatric examiner" (CPL 330.20 [20]) which term is defined in the statute as "a qualified psychiatrist * * * *who has been designated by the commissioner to examine a defendant pursuant to this section"* (CPL 330.20 [1] [s]; emphasis added). Obviously, Dr. Castillo never examined respondent with reference to the within recommitment application, nor, although he knew where respondent resided, is there the slightest indication that any effort was made by him to do so.

It is, accordingly, doubtful whether Castillo's affidavit may be viewed as that of a "psychiatric examiner".

In professing deep satisfaction with the Castillo affidavit, the People and majority not only ignore the very explicit requirements of the statute, but display remarkable short-sightedness. A sufficient supporting affidavit by a psychiatric examiner is required for every application made pursuant to CPL 330.20, and not all CPL 330.20 applications seek the imposition of additional restrictions on insanity acquittees. Many seek the transfer of CPL 330.20 defendants from secure to nonsecure facilities and permission to place them in progressively less restrictive circumstances of confinement leading to release and finally discharge. Presumably, the People would be the first to object to and demand the dismissal of a CPL 330.20 release application accompanied by an affidavit devoid of any reasonably current clinical information. Indeed, is it really possible that we would consider the merits of a discharge or release application accompanied by an affidavit made by a psychiatrist who, not having examined the defendant in 21 months, could provide no information respecting the defendant's current mental status and could state only that there might be clinical grounds for the relief requested? I think my colleagues know what the answer to this query is.

Contrary to the suggestion of appellants that there may be some basis to relax CPL 330.20 (20)'s requirements in the context of a recommitment application where the defendant at the time of the application is at large, the statute makes no such dispensation; it establishes a uniform standard for supporting psychiatric affidavits, requiring, as it should, that any proposed change in an insanity acquittee's status within the CPL 330.20 framework be clinically supported from the outset. In so doing, it properly declines, at least in this respect, to exalt public safety concerns above the liberty interests of defendants. Both require protection. Neither set of interests, however, will receive the measure of protection which is its due if the majority's decision as to the sufficiency of the subject affidavit is permitted to stand; for what the majority must be understood to hold is that courts will entertain any CPL 330.20 application, whether for recommitment or release back to the community, regardless of whether the applicant has made the required initial showing of clinical justification. While this may not, in all cases, ultimately result in unwarranted recommitments and releases, it does remove an important check upon such outcomes and has the additional unfor-

tunate consequence of putting courts and the parties opposed to the relief sought to the very substantial, and what should under the statute be avoidable, burdens entailed by the litigation of applications whose merit has not even been provisionally demonstrated.

In light of the foregoing, it should be plain that appellants' reliance on *People ex rel. Thorpe v Von Holden* (63 NY2d 546) to excuse the careless and dilatory prosecution of their recommitment application is singularly misplaced. It is true, of course, that in *Thorpe,* a habeas corpus proceeding, the Court of Appeals only conditionally ordered the petitioner's release even though the Commissioner had failed to comply with the statutory timetable for the commencement of retention proceedings pursuant to CPL 330.20 (8) *(People ex rel. Thorpe v Von Holden, supra,* at 555). In making its order of release conditional, however, the Court noted that the psychiatric affidavits filed in support of retention adequately documented the clinical predicate for the relief requested. Thorpe, it appeared, had beaten his first wife to death with a hammer and had assaulted his second wife with a rifle butt, and, following the verdict acquitting him of assault in the second degree by reason of mental disease or defect, had been continuously in the Commissioner's custody never having been found to have regained his sanity or to have become nondangerous. Indeed, the examining psychiatrists noted in their affidavits that he remained suspicious of, and hostile toward, his second wife and had threatened to " 'get rid of her' " *(supra,* at 550-552). The Court of Appeals, then, based its determination to afford the Commissioner a final opportunity to retain Thorpe, pursuant to CPL 330.20 (8), upon the evident sufficiency of the retention predicate made out in the supporting affidavits. As should be clear, no comparably sufficient clinical predicate was presented in support of the within recommitment application. Indeed, far from constituting a ground upon which the recommitment application might have been saved, the predicate offered in the Castillo affidavit was so palpably deficient as to mandate the application's dismissal pursuant to CPL 330.20 (20).

Respondent, of course, moved for dismissal of the August 4, 1992 recommitment application on the above-discussed jurisdictional grounds, and that motion ought to have been

granted.[35] Had it been, it is clear that there would have remained no further jurisdictional basis for respondent's recommitment pursuant to CPL 330.20 (14) since respondent's order of conditions expired on August 7, 1992, three weeks before the Commissioner's submission on August 28, 1992, of his revised recommitment application; the latter application, coming as it did after the expiration of the order of conditions, was a nullity (CPL 330.20 [14]; *People v Stone,* 73 NY2d 296, 301). The majority's determination, however, that the earlier August 4, 1992 application provided an adequate jurisdictional basis for recommitment requires that respondent's constitutional challenge to CPL 330.20's recommitment scheme be addressed. For if, as the majority has found, the statute by its terms permits and governs respondent's recommitment, the issue as to the statute's congruence with fundamental law is unavoidable.

This is not the first occasion upon which this Court has addressed the constitutionality of CPL 330.20 (14). In *People v Stone* (138 AD2d 4), Justice Asch, in a majority opinion to which I subscribed, expressed the view that the subject recommitment statute, if read to permit the recommitment of an insanity acquittee who, since his acquittal, had been adjudged no longer dangerous, would be violative of constitutional due process and equal protection guarantees. "A criminal act", wrote Justice Asch, "cannot forever after affect and prejudice an acquittee's right to equal treatment vis-à-vis a person committed in a civil proceeding. Future confinement of the

---

**35.** There is no basis for the majority's attempt by "analogy" to equate the scope of appellate review in a criminal appeal with that obtaining in an appeal occurring within the CPL 330.20 framework. An appeal such as the one at bar, taken pursuant to CPL 330.20 (21), is considered civil in nature and is expressly governed by the CPLR, not the CPL (CPL 330.20 [21] [c]); and pursuant to CPLR 5501 (a) (1) respondent is entitled to have reviewed "any non-final judgment or order which necessarily affects the final judgment, including any which was adverse to the respondent on appeal from the final judgment and which, if reversed, would entitle the respondent to prevail in whole or in part on that appeal". Obviously, the majority's attempt at analogy notwithstanding, respondent is entitled to have the denial of his motion to dismiss the application as insufficiently supported reviewed.

While it is doubtless true that the majority sees "little point" to focusing upon the sufficiency of the supporting affidavit, "the point", entirely deserving of appellate vindication, is that the court should not have exceeded its authority under the statute *(see,* n 34, *supra);* nor should respondent have had to litigate, or have been committed during the lengthy pendency of, a recommitment application whose essential clinical merit had not been even provisionally documented by an examining psychiatrist.

acquittee after the initial determinations adverted to herein [i.e., that the respondent therein did not suffer from a dangerous mental disorder] must be justified under procedures identical to those that apply to civil commitments" *(supra,* at 14). The validity of this dictum, however, never received final appellate confirmation because the Court of Appeals upon consideration of the appeal from this Court's determination, ruled that Stone's challenge to the constitutionality of the statute had not been preserved at the trial level *(People v Stone,* 73 NY2d 296, 303, *supra).* Thus, although the Court of Appeals reversed our determination in *Stone,* it did so solely upon its differing construction of CPL 330.20, holding simply that contrary to the view expressed by this Court, the statute by its terms did not make a prior CPL 330.20 commitment a condition of recommitment pursuant to CPL 330.20 (14), or, in other words, that a prior finding pursuant to CPL 330.20 that a defendant was not dangerously mentally ill did not under the statute preclude application of the statute's recommitment provisions.

Whatever the state of the trial record may have been in *Stone (supra),* it is clear that the constitutional issues have been emphatically preserved in the present trial record and, that they were exhaustively briefed and argued before us and accordingly, that there exists no procedural or, given the majority's resolution of the jurisdictional issues, prudential impediment to their consideration.

In *Addington v Texas* (441 US 418, 425), the Supreme Court reiterated the axiomatic proposition that "commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection"; and, having already established in *O'Connor v Donaldson* (422 US 563, 574), that, substantively, due process entails a "constitutionally adequate purpose for the confinement", went on to hold that, procedurally, "due process requires the state to justify confinement by proof more substantial than a mere preponderance of the evidence" *(Addington v Texas, supra,* at 427). The *Addington* Court concluded that a proper allocation of the risks of unjustified psychiatric confinement as between the individual whose confinement was sought, and the State required, that the State make out the case for confinement by clear and convincing evidence.

In accordance with these constitutional precedents, we have in this State promulgated a body of civil law designed to assure that no person will be involuntarily committed to a

psychiatric institution in the absence of a constitutionally adequate purpose and that no commitment will be compelled except by means of procedures at least as protective of the proposed committee's liberty interest as the Federal Constitution's Due Process Clause demands. Coexisting with this body of civil law known as the Mental Hygiene Law is CPL 330.20 which, as we have already had ample occasion to note, governs the postverdict disposition of insanity acquittees. While sharing, substantially, the same basic purposes as the Mental Hygiene Law, CPL 330.20 prescribes procedures for compelling inpatient psychiatric care and determining when it may be brought to an end considerably more protective of society and commensurately less protective of the individual than those utilized pursuant to its civil counterpart. The question posed by this disparity is whether it violates the rights of insanity acquittees to due process and equal protection of the law. It is an inquiry which has been answered as to some but not all portions of the postverdict statute.

In *People ex rel. Henig v Commissioner of Mental Hygiene* (43 NY2d 334), the Court of Appeals had occasion to consider the constitutionality of the automatic postverdict commitment provisions contained in CPL 330.20 prior to its amendment in 1980. In upholding the constitutionality of those provisions permitting the initial postverdict commitment of an insanity acquittee without a hearing and without a prior determination as to whether the acquittee was, at the time of the commitment, dangerously mentally ill, the Court noted its view that there existed in the limited context of a dispositional determination directly following the verdict a rational basis to afford the liberty interests of insanity acquittees a lesser measure of procedural protection than would otherwise be constitutionally acceptable: "An individual who has committed an act of violence, and has thus demonstrated his dangerousness, and who has successfully asserted an insanity defense, may quite properly be treated somewhat differently from other individuals who, although they may in fact be potentially equally dangerous as a result of mental problems, have not yet so vehemently demonstrated their dangerousness by violent antisocial behavior" *(supra,* at 338). The Court reasoned that the antisocial conduct claimed by the acquittee himself to have been the consequence of insanity raised a presumption of continuing dangerous mental illness itself adequate to sustain commitment directly following a not responsible verdict. Having so held, however, the Court was

careful to add that the presumption upon which it had deemed permissible the disparate treatment of insanity acquittees in the immediate aftermath of the verdict "may not ripen to a conclusion of dangerousness in every case, and should not be blindly applied to deprive an individual of his liberty" *(supra,* at 340), and for this reason indicated that there should be a prompt postcommitment hearing to ascertain whether, the presumption notwithstanding, the acquittee remained dangerously mentally ill *(supra,* at 340).

In July of 1979, some one and a half years after *Henig (supra),* the Court of Appeals handed down its decision in *Matter of Torsney* (47 NY2d 667). *Torsney,* of course, concerned the adjudication of an application to release an insanity acquittee, Torsney, from the Commissioner's custody, which application came barely more than half a year after the verdict absolving Torsney of criminal responsibility for the fatal shooting of a teenager. Although the hearing court granted the application to the extent of ordering Torsney conditionally released, the Appellate Division, Second Department, reversed, finding, as is here relevant, that "[a] dangerous detainee [can] be confined even if not mentally ill or in need of immediate treatment, under CPL 330.20" (66 AD2d 281, 288, n 6). The Court of Appeals disagreed, reversed the Appellate Division and reinstated the hearing court's determination (47 NY2d, *supra,* at 684). In so doing, the Court held that the presumption upon which the disparate treatment challenged in *Henig* had been found permissible would not sustain a disparity of the sort the Appellate Division had approved—that insanity acquittees no less than those committed via the civil commitment laws were entitled to release unless their commitment was justified by a showing of both a present mental illness requiring inpatient care and consequent dangerousness *(Matter of Torsney, supra,* at 675).

Regarding the nature and limits of the presumption relied upon in *Henig (supra),* the plurality in *Torsney*[36] *(supra,* at 673-674) first observed in apparent agreement with *Henig:* "Unquestionably, the unique status of persons acquitted of a crime by reason of mental disease or defect permits the State to treat this 'exceptional class' somewhat differently from other individuals believed suffering from mental disease or defect.

**36.** Judge Meyer filed a separate concurrence which as Judge Fuchsberg, who concurred in both the plurality opinion and the concurrence, noted was entirely consistent with what had been said in the plurality writing.

Because such persons have demonstrated past antisocial behavior, the State is permitted to engage in what may be broadly termed a presumption that the causative mental illness or defect continues beyond the date of the criminal conduct to the date of acquittal. *(People ex rel. Henig v Commissioner of Mental Hygiene,* 43 NY2d, at p 340, *supra.)"* The Court, however, then added the following qualifying language the relevance of which to the present appeal cannot be overstated:

"Of course, the flaw in viewing this principle as a true presumption is readily apparent: namely, the possibility that years may have intervened between commission of the crime charged and the date of acquittal.[37] * * *

"Thus, it may be said more accurately that the presumption flowing from an acquittal by reason of mental disease or defect does not presume that a person so acquitted presently suffers from mental disease or defect, but, rather, posits merely that having raised this defense and having previously engaged in antisocial behavior, he has demonstrated sufficient grounds for further examination to determine his present need for treatment and confinement as opposed to immediate release. [Citation omitted.] *It is for this purpose only—a prompt examination and report as to sanity—that such a person may be automatically committed to the custody of the Commissioner of Mental Hygiene upon acquittal.* [Citations omitted.] * * *

*"Beyond automatic commitment of persons found not guilty by reason of mental disease or defect for a reasonable period to determine their present sanity, justification for distinctions in treatment between persons involuntarily committed under the Mental Hygiene Law and persons committed under CPL 330.20*

---

**37.** The Court at this juncture went on to note that the difficulty in viewing the *Henig* presumption as conclusive was "further buttressed" by the circumstance that insanity was a defense to be disproved by the prosecution beyond a reasonable doubt and consequently that an acquittal fairly signified only that the prosecution had failed to meet its burden not that the defendant was in fact insane *(supra,* at 674). Insanity has since *Torsney* been redefined in the Penal Law as an affirmative defense (Penal Law § 40.15), so that it may be argued that the *Henig* presumption is warranted at least to the extent that an insanity acquittal now entails a finding that mental disease or defect at the time of the crime's commission was established by a preponderance. This, however, does not detract from *Torsney's* principal and still valid observation that the existence of a long, or as in the case at bar very long, period between the crime and the acquittal casts considerable doubt on the presumption's continuing validity.

*draws impermissibly thin." (Matter of Torsney, supra,* at 674-675; emphasis added.)

As can be seen, to the extent that *Henig (supra)* left any question as to the precise significance and duration of the presumption upon which it had relied, the matter was clarified by *Torsney (supra),* which held unambiguously that the presumption, far from affording an open-ended basis for denying insanity acquittees the procedural and substantive protections of the Mental Hygiene Law, would justify only a brief postverdict confinement for the limited purpose of determining whether the acquittee remained dangerously mentally ill. The unmistakable import of *Torsney* is that at the conclusion of the prompt postverdict sanity hearing required by *Henig,* the acquittee must either be committed pursuant to procedures and substantive standards consonant with the Mental Hygiene Law or released; or, in other words, that following the postverdict sanity determination there exists no further predicate justifying the disparate treatment of insanity acquittees, even those found to be in need of continued inpatient care and treatment.

*Torsney (supra)* was, of course, a controversial decision as, legal questions aside, there was a wide public perception that if indeed Torsney's acquittal for the point-blank shooting of a young person had been justified—and many believed it had not been—the nonpenal consequences stemming from the homicide and the defendant's claim of insanity in connection therewith were neither sufficiently serious nor prolonged. One year after *Torsney,* the Legislature enacted the Insanity Defense Reform Act of 1980, comprehensively amending CPL 330.20 (L 1980, ch 548), and while the amendments were in some respects responsive to the constitutional concerns expressed by the *Torsney* majority, it is clear that the primary purpose of the legislation was to provide within CPL 330.20 a comprehensive postverdict supervisory apparatus which would closely govern the terms of the commitment and release of insanity acquittees for as long as 10 years after the initial postacquittal sanity hearing.

The extent to which the 1980 amendments to CPL 330.20 displaced the Mental Hygiene Law and in so doing prescribed for insanity acquittees a distinct alternative body of law, the over-all effect of which was to make their commitment easier and their release more difficult, only became fully apparent after the Court of Appeals decision in *Stone (supra).* For what *Stone* held was that, notwithstanding the statute's apparent

attempt to place reasonable limits on its prospective applicability based upon findings as to a defendant's sanity and dangerousness made at the initial postacquittal hearing (CPL 330.20 [6], [7]), the statute still, by its terms, permitted the recommitment pursuant to CPL 330.20 (14) of a defendant found neither dangerous nor mentally ill at the initial hearing and that it permitted such recommitment at any time during the pendency of an order of conditions, a period conceivably running for some 10 years following the initial postacquittal hearing *(People v Stone, supra,* at 300).

Appreciation of the full import of the holding in *Stone (supra)* entails recognition of the fact that a CPL 330.20 (14) recommitment is distinctly different in its procedures and consequences than an involuntary commitment pursuant to the Mental Hygiene Law. Although the substantive commitment standards found in CPL 330.20 (14) are not substantially different from those found in Mental Hygiene Law § 9.39, it is urged, and for present purposes may be conceded *(see, infra,* n 38), that recommitment pursuant to CPL 330.20 (14) may be obtained upon a less weighty showing than would be required in support of an involuntary civil commitment; the civil commitment due process requirement of clear and convincing evidence that the proposed committee is dangerously mentally ill *(see, Addington v Texas, supra,* at 425) is, according to the State and the People, relaxed in the CPL 330.20 context to permit recommitment upon a showing of dangerous mental illness by a mere preponderance of the evidence *(see, People v Escobar,* 61 NY2d 431, 457-458).[38] And, while the requisite finding of dangerous mental illness is significantly easier for the commitment or recommitment applicant to obtain under CPL 330.20 than a comparable finding would be under the Mental Hygiene Law *(see, People ex rel. Thorpe v Von Holden, supra,* at 555), it entails consequences of a far more restrictive and prolonged sort.

Once a finding of dangerous mental illness is made pursuant

---

**38.** Although the holding in *Escobar* concerns only the burden applicable in proceedings to *continue* a defendant in the Commissioner's custody *(see, People v Escobar, supra,* at 434), and does not address the extent to which relaxation of the *Addington* burden may be permitted in the context of a recommitment proceeding, I accept for purposes of argument only, appellants' contention that the applicant's burden is, pursuant to the statute, uniformly relaxed in CPL 330.20 commitment, retention and recommitment proceedings. Whether such relaxation is in the recommitment context constitutionally permissible, I would stress, remains an open question which *Escobar* does not even purport to decide.

to CPL 330.20 (14), the defendant must be committed to a secure facility *(see,* CPL 330.20 [14], [1] [f]); the court has no discretion to direct, as it would routinely in the civil commitment context, that the committee be cared for at an ordinary inpatient State psychiatric hospital, even one with a secure unit, but must remand the committee to a psychiatric facility with all the trappings and concomitant restrictions of a maximum security prison *(see,* CPL 330.20 [1] [f], [b]). Further, the initial period of commitment for a defendant recommitted pursuant to CPL 330.20 (14) is six months *(see,* CPL 330.20 [1] [f]), considerably longer than the 15-day initial confinement permitted pursuant to Mental Hygiene Law § 9.39; and, subsequent to the initial term of confinement, retention under CPL 330.20 may be sought for periods significantly longer than the corresponding maximum retention periods under the Mental Hygiene Law, with the consequence that the intervals between statutorily mandated judicial review of the continued propriety of the defendant's commitment are concomitantly less frequent. Moreover, on the occasion of such review the evidentiary standards to be met by the proponent of continued secure confinement are, according to the statute, the same as those ordinarily applicable in the context of a CPL 330.20 retention application *(see,* CPL 330.20 [14]), namely, the relaxed *Escobar* standard of proof to a preponderance that the defendant remains dangerously mentally ill. Finally, once recommitted pursuant to CPL 330.20 (14), any change in a defendant's status involving some lessening of the restrictions placed upon his or her liberty (i.e., transfer to a nonsecure facility pursuant to CPL 330.20 [11], furlough pursuant to CPL 330.20 [10], release pursuant to CPL 330.20 [12], or discharge pursuant to CPL 330.20 [13]) will require court approval, and, at the court's or District Attorney's option, a hearing precedent thereto at which the District Attorney may block the requested relief by adducing proof to a mere preponderance that the defendant remains dangerously mentally ill *(see, Matter of Torres [People],* 166 AD2d, *supra,* at 230). Thus, what are basically clinical decisions which, in the context of a civil commitment would, once made, be executed with relative expedition, are, in the case of a defendant committed or recommitted pursuant to CPL 330.20 (14), transformed into occasions for intense and lengthy tripartite litigation. Given the need for expert psychiatric testimony by both the proponents and opponents of any litigated application to augment a CPL 330.20 committee's liberty, hearings upon such applica-

tions tend to be difficult to schedule and long in duration and may be followed by a drawn-out appellate process *(see,* CPL 330.20 [21]) so that, practically speaking, it may be years before a recommitted defendant receives even those privileges which the Commissioner at the time of his application believed clinically appropriate.

As can be seen, CPL 330.20's recommitment scheme constitutes a dramatic displacement of the civil commitment laws pursuant to which an insanity acquittee may, years after the criminal conduct culminating in his or her insanity acquittal, be committed and retained with an ease altogether alien to the civil commitment laws otherwise governing the involuntary confinement and retention of persons dangerously mentally ill. That such a displacement cannot be reconciled with *Torsney (supra)* is clear, for with CPL 330.20 we have a marked disparity in the treatment of insanity acquittees not terminating at the initial postacquittal sanity hearing or even at the conclusion of any continuous period of secure psychiatric hospitalization following thereupon, but persisting beyond the finding that the acquittee is no longer dangerous and indeed beyond the acquittee's release from institutional care, to proceedings for recommitment possibly separated from the original criminal conduct by more than a decade and, conceivably, if the People's and State's jurisidictional claims are to be accepted, by an even longer time. To the extent that the Legislature in enacting the Insanity Defense Reform Act of 1980 sought to assure that an insanity acquittal would have substantial and prolonged consequences of a nominally nonpenal sort, it is clear that it succeeded, perhaps beyond its expectations. To the extent, however, that the Legislature attempted to bring about this result without violating the due process and equal protection rights of insanity acquittees, it is clear that it failed. Indeed, given *Torsney's* pronouncement that "[b]eyond automatic commitment of persons found not guilty by reason of mental disease or defect for a reasonable period to determine their present sanity, justification for distinctions in treatment between persons involuntarily committed under the Mental Hygiene Law and persons committed under CPL 330.20 draws impermissibly thin" *(Matter of Torsney, supra,* at 674-675), the recommitment provisions of the Insanity Defense Reform Act of 1980 were at the time of their enactment a virtual invitation to constitutional invalidation.

It is true, of course, as the People and State point out, that since the Court of Appeals decision in *Torsney (supra)* and the

consequent enactment of the Insanity Defense Reform Act of 1980, the United States Supreme Court decided *Jones v United States* (463 US 354), and in so doing gave reason to question whether the stringent limitations *Torsney* would have placed upon the disparate treatment of insanity acquittees were compelled, to the extent *Torsney* had indicated, by the Federal Constitution's due process and equal protection guarantees. The issue in *Jones* was whether a shoplifter prosecuted under the laws of the District of Columbia for attempted petit larceny, and subsequently acquitted of that offense by reason of insanity could be constitutionally committed and thereafter held indefinitely without resort to the procedural protections constitutionally due in the civil commitment context. The Court held that "when a criminal defendant establishes by a preponderance of the evidence that he is not guilty of a crime by reason of insanity, the Constitution permits the Government, on the basis of the insanity judgment, to confine him to a mental institution until such time as he has regained his sanity or is no longer a danger to himself or society" *(Jones v United States, supra,* at 370). In so holding, the Court reasoned much as had the New York Court of Appeals in *Henig (supra)* that the defendant's admitted commission of criminal conduct combined with his or her success in obtaining a judgment of acquittal on the ground of insanity justified a continuing inference of dangerous mental illness sufficient to support automatic postacquittal commitment. Here, however, *Jones* parted company with *Henig,* for whereas *Henig* invoked the presumption held justified by the insanity acquittal only to support a brief, postacquittal confinement and indeed appeared to do so with the understanding that subsequent treatment of the insanity acquittee would be governed by the Mental Hygiene Law *(see, People ex rel. Henig v Commissioner of Mental Hygiene, supra,* at 339), *Jones* held that the same presumption, or as it termed it "inference", would suffice under the Constitution as a predicate for psychiatric confinement until such time as the acquittee had been found either to have returned to sanity or to have become nondangerous. The *Addington* due process requirements then, could, according to *Jones,* be displaced indefinitely in the immediate aftermath of an insanity acquittal, pending a finding of recovery or nondangerousness.

Having noted what *was* decided in *Jones (supra),* it is important, especially in light of appellants' rather extravagant claims as to its import, to underscore what *Jones* did *not*

decide. *Jones* expressly did not address the constitutionality of that portion of the District of Columbia's postverdict statute (the District of Columbia analogue to CPL 330.20) requiring the defendant, as a condition of release, to prove his sanity or nondangerousness by a preponderance;[39] indeed, the Court did not address the constitutionality of any aspect of the subject statute's release provisions *(Jones v United States, supra,* at 363, n 11).[40] And, certainly, the Court, having expressly not addressed such issues and accordingly not ruled upon whether the inference upon which it had relied would suffice, even within the context of a psychiatric hospitalization immediately following upon an insanity acquittal, to justify disparate release procedures, there can be no claim that *Jones* even remotely purported to approve the use of such an inference to justify disparate treatment of insanity acquittees on the occasion of a subsequent and possibly very long-removed rehospitalization. Indeed, that *Jones* cannot be read to place a constitutional imprimatur upon disparate recommitment provisions such as those contained in CPL 330.20 is conclusively established by the Supreme Court's recent decision in *Foucha v Louisiana* (504 US —, 112 S Ct 1780).

---

**39.** The Court held only that the acquittee might be committed upon the strength of the cited inference until "he has regained his sanity or is no longer a danger to himself or society" *(Jones v United States, supra,* at 370), it did not offer any view as to whether the District of Columbia's requirement that all insanity acquittees, as a condition of release, demonstrate sanity or nondangerousness by a preponderance comported with due process or equal protection *(see, infra,* n 40).

**40.** The Court stated:

*"It is important to note what issues are not raised in this case.* Petitioner has not sought appellate review of the Superior Court's findings in 1976 and 1977 that he remained mentally ill and dangerous, and, indeed, the record does not indicate that since 1977 he ever has sought a release hearing—a hearing to which he was entitled every six months.

*"Nor are we asked to decide whether the District's procedures for release are constitutional.* As noted above * * * the basic standard for release is the same under either civil commitment or commitment following acquittal by reason of insanity: the individual must prove by a preponderance of the evidence that he is no longer dangerous or mentally ill. There is an important difference, however, in the release provisions for these two groups. A patient who is committed civilly is entitled to unconditional release upon certification of his recovery by the hospital chief of service * * * whereas a committed insanity acquittee may be released upon such certification only with court approval * * *. *Neither of these provisions is before the Court, as petitioner has challenged neither the adequacy of the release standards generally nor the disparity in treatment of insanity acquittees and other committed persons.* [Citation omitted.]" *(Jones v United States, supra,* at 363, n 11; emphasis added).

The petitioner in *Foucha (supra)* had been charged under Louisiana law with aggravated burglary and illegal discharge of a firearm. He was acquitted of those offenses by reason of insanity and thereafter committed to a State psychiatric hospital in Feliciana, Louisiana. Several years later the superintendent of the Feliciana facility applied to the court for Foucha's conditional release. In support of the application, two psychiatrists certified that Foucha's mental illness had gone into remission. Neither psychiatrist, however, would certify that Foucha, who suffered from an antisocial personality disorder and had been repeatedly assaultive during his stay at the Feliciana psychiatric hospital, was not dangerous, and the release application was denied; in the face of the psychiatrists' unwillingness to certify that he could be safely released, Foucha was unable to carry the burden placed upon him by State law of proving, as a condition of release, that he was no longer dangerous. In ruling that the State could not retain Foucha in a psychiatric hospital simply because, notwithstanding the recovery of his sanity, he remained dangerous, the Court relied upon its prior constitutionally grounded holding in *Jones (supra)*: " '[t]he committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous' " *(Foucha v Louisiana,* 504 US, *supra,* at —, 112 S Ct, *supra,* at 1784, quoting *Jones v United States, supra,* at 368). The case was legally, if not factually, a simple one: Foucha had recovered his sanity; he was therefore entitled to be released from psychiatric confinement.

The due process analysis in *Foucha (supra)* is of crucial importance to the disposition of the issues before us, for that analysis demonstrates with consummate clarity that the Supreme Court not only viewed the *Jones* holding *(supra)* as articulating the minimum constitutional predicate necessary to sustain psychiatric confinement following an insanity acquittal, but also as delineating the furthest extent to which the inference of continuing dangerous insanity, permissibly drawn from the judgment of acquittal, might be taken in justification of any disparity in the treatment of insanity acquittees. The Court observed,

"In this case, Louisiana does not contend that Foucha was mentally ill at the time of the trial court's hearing. *Thus, the basis for holding Foucha in a psychiatric facility as an insanity acquittee has disappeared, and the State is no longer entitled to hold him on that basis. O'Connor, supra,* 422 U.S., at 574-575 * * *

"The State, however, seeks to perpetuate Foucha's confinement at Feliciana on the basis of his antisocial personality which, as evidenced by his conduct at the facility, the court found rendered him a danger to himself or others. There are at least three difficulties with this position. *First, even if his continued confinement were constitutionally permissible, keeping Foucha against his will in a mental institution is improper absent a determination in civil commitment proceedings of current mental illness and dangerousness*" *(Foucha v Louisiana,* 504 US, *supra,* at —, 112 S Ct, *supra,* at 1784; emphasis added).

This basic point, namely, that an insanity acquittee whose psychiatric confinement is no longer permissible pursuant to the substantive due process standards set forth in *Jones (supra),* is on the occasion of any subsequent psychiatric hospitalization (except, of course, one resulting from a subsequent insanity acquittal) entitled to be treated in the same manner as a candidate for civil commitment, would be reiterated in the course of the ensuing opinion. Indeed, the Court stated, "if Foucha can no longer be held as an insanity acquittee in a mental hospital, he is entitled to constitutionally adequate procedures to establish the grounds for his confinement" (504 US, *supra,* at —, 112 S Ct, *supra,* at 1785), and left no doubt that by "constitutionally adequate procedures" it meant the procedures required by due process to be utilized in civil commitment proceedings. In this connection, the Court indicated that there was no relevant distinction to be drawn between an insanity acquittee no longer confinable as such pursuant to *Jones* and a defendant incompetent to stand trial already hospitalized long enough to determine whether he or she could be cured or rendered competent, or, for that matter, between either of the aforementioned and a mentally ill convict nearing the end of a penal term. In each case subsequent involuntary psychiatric confinement was permissible only if obtained by means of civil commitment laws complying with the applicable constitutional due process requirements *(Foucha v Louisiana,* 504 US, *supra,* at —, 112 S Ct, *supra,* at 1785, citing *Jackson v Indiana,* 406 US 715, 724; *Baxstrom v Herold,* 383 US 107, 111-112). Further underscoring the essential proposition that an insanity acquittee no longer committable as such under *Jones* could not be subsequently recommitted except as a civil committee, was the Court's observation that if indeed Foucha was to be recommitted, the State would have to prove by clear and convincing

evidence *(see, Addington v Texas, supra)* that he was both mentally ill and dangerous: "The State may also confine a mentally ill person if it shows 'by clear and convincing evidence that the individual is mentally ill and dangerous,' *Jones,* 463 U.S., at 362 * * *. Here, the State has not carried that burden; indeed, the State does not claim that Foucha is now mentally ill" *(Foucha v Louisiana,* 504 US, *supra,* at —, 112 S Ct, *supra,* at 1786).

Plainly then, when the holding in *Jones (supra)* is viewed through the sharply defining lens of *Foucha (supra),* the outer boundaries of permissible disparity in the State's treatment of insanity acquittees are thrown into vivid relief. While the extent of permissible disparate treatment in the period between the judgment of acquittal and the failure of either of the substantive conditions necessary under *Jones* to justify continued psychiatric commitment of an insanity acquittee remains in some respects less well defined *(see, Jones v United States, supra,* at 363, n 11), there can be no doubt that subsequent to the failure of one of those conditions disparate treatment of insanity acquittees—even those again dangerously afflicted with psychiatric illness and therefore in need of rehospitalization—must cease. Thus, while *Escobar's* relaxation of the clear and convincing evidentiary burden in the context of CPL 330.20 commitment and retention proceedings may be permissible pursuant to *Jones,*[41] it is clear after *Foucha* that once the postacquittal commitment of an insanity acquittee has been duly terminated upon a finding of either sanity or nondangerousness, there can be no further departure from the due process requirements set forth in *Addington (supra).* Indeed, even prior to *Foucha,* the limits of the disparity sanctioned by *Jones* were apparent; as the New York Court of Appeals noted in *Thorpe (supra),* once it had been determined in the context of CPL 330.20 retention proceedings that an insanity acquittee no longer suffered from a dangerous mental disorder, any subsequent finding that psychiatric hospitalization was necessary by reason of "mental illness" *(see,*

---

41. I use the word "may" advisedly, for contrary to *Escobar (see, People v Escobar, supra,* at 439), *Jones* did not uphold the validity of that portion of the District of Columbia postverdict statute requiring the defendant, as a condition of release, to prove his sanity or nondangerousness by a preponderance. The constitutionality of the procedures employed by the District of Columbia postverdict statute, other than its automatic commitment provision, was simply not before the Court in *Jones (see, Jones, v United States, supra,* at 363, n 11).

CPL 330.20 [8], [1] [d]) would necessarily be governed by the procedural due process standards articulated in *Addington (People ex rel. Thorpe v Commissioner of Mental Hygiene, supra,* at 555, n 2).

As can be seen, while *Torsney (supra)* may have too narrowly defined the range of constitutionally tolerable disparity in the treatment of insanity acquittees, its essential recognition that there was a point beyond which disparate treatment could not extend without violating fundamental principles of due process and equal protection has been amply confirmed. Under the Federal Constitution that point is certainly met once it is determined that an insanity acquittee has either recovered his or her sanity or is no longer dangerous. This being the case, it should be absolutely clear that the recommitment provisions of the Insanity Defense Reform Act of 1980 are unconstitutional. As noted, those provisions perpetuate the disparate treatment of insanity acquittees well beyond the remission of dangerous mental illness and indeed beyond the release of the acquittee back to society, to permit rehospitalization on terms considerably at variance with those governing involuntary civil commitment. Indeed, the effect of the subject recommitment provisions is, in the case of an insanity acquittee afflicted with a recurrence of dangerous mental illness, to require, for as long as 10 years after the constitutionally critical finding of remission, the recapitulation of CPL 330.20's entire postacquittal commitment scheme which, as we have already had occasion to observe, is specifically designed to make commitment and retention easier, the conditions of hospitalization more restrictive, and release more difficult than would be the case in the civil commitment context. After *Foucha (supra)* there quite simply is no argument that so massive a displacement of the civil commitment laws at a point subsequent to a finding as to an acquittee's remission from dangerous mental illness is constitutionally tolerable.

It should be stressed that the constitutionally objectionable disparity here addressed is not neatly confined to the area of evidentiary burdens, and cannot be remedied simply by reallocating those burdens to conform with *Addington (supra).* Rather, the objectionable disparity pervades the whole of the CPL 330.20 recommitment scheme and can be remedied only by such measures as will assure that the recommitment of an insanity acquittee will be governed by laws substantially identical to those applicable in the civil commitment arena. As *Jones (supra)* and *Foucha (supra)* implicitly recognize, there

is no rational basis for permitting any disparity in the treatment of insanity acquittees once the period of confinement following upon the acquittal has been duly concluded with a finding that the acquittee is no longer dangerously mentally ill. Should there be any subsequent recurrence of dangerous mental illness there is no reason why the State's interest in assuring public safety cannot be vindicated by resort to the civil commitment laws.

There has, in fact, never been any particularly persuasive rationale advanced for treating insanity acquittees differently from other candidates for involuntary psychiatric commitment. A judgment of acquittal on any ground, including insanity, removes from the State any justification for imposing punishment *(Jones v United States, supra,* at 369). If, then, the State after an acquittal seeks to commit the acquittee, it may not do so for reasons of a penal sort but solely to treat the acquittee and protect society. The permissible substantive grounds for involuntary psychiatric hospitalization are · thus no different when the State confines an insanity acquittee than when it confines anyone else. It is only procedurally that the insanity acquittee stands in a somewhat different relation to the State than a candidate for civil commitment. This is because the acquittee in obtaining the judgment of acquittal has himself only recently claimed to have been insane at the time of the otherwise proven offense. Given the provenance of the claim and the fact that the claim was deemed to possess sufficient probative force to relieve the defendant of criminal responsibility for antisocial acts proven beyond a reasonable doubt, it has been held reasonable to relieve the State in the immediate aftermath of the acquittal of the obligation of litigating anew the issues of the acquittee's sanity and dangerousness. It should be stressed that this dispensation arises not because insanity acquittees are, as a group, clinically different from other dangerously mentally ill persons; for notwithstanding the observation in *Henig (supra,* at 338) that insanity acquittees more "vehemently demonstrated their dangerousness", it is clear that anyone duly admitted to a psychiatric unit under the civil commitment laws for emergency observation, care and treatment has in some manner made a most vehement demonstration of his or her dangerousness.[42] Rather,

---

**42.** Section 9.39 of the New York State Mental Hygiene Law, for example, authorizes the civil commitment of a person who has manifested his or her psychiatric illness by *"threats of or attempts at suicide or serious bodily*

the permissible distinction in treatment arises solely by reason of the proximity of the judgment of acquittal to any immediately ensuing psychiatric commitment, the propriety of the latter being thought sufficiently established by the recent determination of similar dispositional issues in the former. There is, of course, basis to question whether the issues concluded in the criminal proceeding do in fact correspond closely enough to those posed in the ensuing involuntary commitment context to obviate the need for further litigation; as *Torsney (supra)* pointed out, given the substantial gap often intervening between the criminal act and the judgment of acquittal, it is doubtful whether such proof as there was at the criminal trial of dangerous insanity at the time of the charged conduct can be equated with proof of the same's persistence beyond the judgment of acquittal. Assuming, however, that the judgment of acquittal does in its immediate aftermath afford a rational basis for relieving the State from litigating once again the issues of the defendant's sanity and dangerousness, it is important to recognize that the subject dispensation is in the final analysis justified only by the unique procedural context in which the propriety of postacquittal commitment is considered. An application for recommitment is adjudicated in a dramatically different context. There, the claim of dangerous insanity does not come from and has not been in any measure proved by the proposed committee; the claim originates solely with the State and necessarily pertains to psychiatric illness and causally related conduct which has allegedly occurred since the acquittee's initial postacquittal hospitalization and release. Neither the State's claim of mental illness nor the way in which the illness has allegedly become dangerously manifest, has at the time of the recommitment application been the subject of any proof. These are new claims asserted by the State alone and necessarily grounded not in the circumstances proven in connection with the judgment of acquittal but in recent and unproven clinical and extraclinical developments. They are, moreover, claims conceivably made many years subsequent to the acquittee's extensive postacquittal psychiatric evaluation and, where indicated, course of

---

*harm or other conduct demonstrating that he is dangerous to himself, or* * * * *homicidal or other violent behavior by which others are placed in reasonable fear or serious physical harm"* (Mental Hygiene Law § 9.39 [a] [1], [2]; emphasis added). It should be noted in this connection that even *Henig* acknowledged that persons civilly committed "may in fact be potentially equally dangerous" *(supra,* at 338).

inpatient treatment, and after an intervening judicial determination that the acquittee no longer suffers from a dangerous mental illness. Under these circumstances there can be no presumed identity as between the legal and factual issues concluded in the judgment of acquittal and those to be decided in adjudicating the issues pertinent to recommitment. At the point recommitment is sought, there no longer stems from the judgment of acquittal any sustainable presumption or inference of continuing dangerous mental illness. The insanity acquittee as to whom recommitment has been sought stands before the court no differently situated than any other former psychiatric patient who has allegedly suffered a relapse into dangerous mental illness; if he or she is to be rehospitalized it must be by means of, and thereafter in accordance with, the laws governing civil commitment.

It is only if the within proceeding is not to be dismissed on either jurisdictional or constitutional grounds that appellants' invitation to this Court to rewrite CPL 330.20 (14) need be considered. The standard for recommitment pursuant to that statute bears repetition: required is (1) a showing by the applicant that the defendant "*currently* suffers from a 'mental illness' as that term is defined in subdivision twenty of section 1.03 of the Mental Hygiene Law", which subdivision defines mental illness as "an affliction with a mental disease or mental condition *which is manifested* by a disorder or disturbance in behavior, feeling, thinking, or judgment to such an extent that the person afflicted requires care, treatment and rehabilitation"; and (2) an additional showing by the applicant "that *because of such condition* [the defendant] *currently* constitutes a physical danger to himself or others" (CPL 330.20 [1] [c] [defining "dangerous mental disorder"]; emphasis added). It is virtually conceded on the above-summarized record that at the time of respondent's hearing he was largely asymptomatic and, in any case, did not constitute a physical danger to anyone. Indeed, the Assistant Attorney-General stated at the hearing that "the state has conceded that in the hospital the doctors testify he [respondent] is in remission, partial remission, and he's a good patient." Properly understood then, the State's contention was not, and given the proof, could not have been that respondent suffered from a current, seriously symptomatic mental illness which rendered him physically dangerous, but that, based on respondent's history, there was a likelihood that, if released, he would at some future time become dangerous. Appellants thus urge

that an insanity acquittee may be recommitted and retained indefinitely in a secure psychiatric facility, not because he or she presently suffers from a dangerous mental disorder but because given his or her history of antisocial behavior it would appear likely that if the acquittee were allowed his or her liberty such conduct would recur. What appellants propose is quite simply not what the statute provides. As the hearing court correctly understood from the plain language of the statute and this Court's decision in *Torres* (166 AD2d 228, *supra)*, the finding required by the statute as a predicate for secure psychiatric commitment is not that the defendant may upon the happening of certain contingencies become dangerous, but that, speculation aside, the defendant does, in fact, *currently* suffer from a dangerous mental disorder.

The defendant in *Torres (supra)* had killed a man and was thereafter acquitted of second degree murder by reason of insanity. Following the acquittal, he was remanded to the custody of the Commissioner of Mental Health and, in light of findings as to his continuing dangerousness, remained securely hospitalized for some nine years. Toward the end of this period, an application was made by the Commissioner to transfer Torres to a nonsecure facility on the ground that he was no longer dangerously mentally ill. It appears that Torres, who bore the diagnosis of paranoid schizophrenia during his entire postacquittal hospitalization, had gone into remission after being medicated against his will with an antipsychotic agent, and had improved to the point that the Commissioner deemed the transfer application appropriate. During the pendency of the application, however, Torres briefly decompensated leading to the application's withdrawal. Indeed, Dr. Klebanov, Torres' treating psychiatrist, would testify at the hearing upon the subsequent application to retain Torres at a secure psychiatric facility, that Torres did not have sufficient insight respecting his illness to be safely transferred to a nonsecure facility. Klebanov predicted that Torres would discontinue his medication and thereafter become dangerously psychotic. In his written report in support of the retention application Klebanov stated that while hospitalized Torres had been involved in a number of violent incidents, one of which was quite recent; that Torres remained extremely paranoid; and that Torres had been poorly compliant with his medication regimen. Notwithstanding all of this, this Court affirmed the decision of the hearing court to transfer Torres, doing so in reliance upon testimony by a court-

appointed independent psychiatrist to the effect that Torres did not at the time of the retention application suffer from a dangerous mental disorder and would not suffer a recurrence of psychosis while he remained appropriately medicated. Regarding Dr. Klebanov's opinion as a ground for retaining the defendant in a secure facility this Court stated, "that opinion was based on speculation that defendant was mentally ill and that should he discontinue his medication he may attempt to escape. However, to find that defendant has a 'dangerous mental disorder' the statute requires a showing that defendant 'currently constitutes a physical danger to himself or others' (CPL 330.20 [1] [c]). Dr. Klebanov's opinion does not establish that defendant *currently* poses a danger, but would pose such a threat only in the event that he discontinue his medication in the future" *(Matter of Torres [People], supra,* at 230-231; emphasis in original).

Plainly, if it were permissible in ruling upon the propriety of secure psychiatric commitment pursuant to CPL 330.20 to substitute a prognostication of future dangerousness for a finding of current dangerousness, *Torres (supra)* would have been decided differently. It was, after all, undisputed that Torres had killed another person while psychotic and that he continued to suffer from the same underlying mental illness that had caused him to become psychotic at the time of the homicide. It was, moreover, clear that Torres' condition had improved only when he was forced to take antipsychotic medication, and that, demonstrably, without the medication he would relapse into psychosis. Nevertheless, this Court held that because Torres was not currently dangerous he could not be retained in a secure psychiatric facility pursuant to CPL 330.20.

The within matter presents, if anything, a very much weaker case for secure psychiatric hospitalization. For here, not only is it conceded that respondent was not at the time of his hearing dangerous, but, in contrast to *Torres (supra),* where there was compelling and undisputed evidence of a very serious and potentially extremely dangerous underlying psychiatric disorder, there was in the present case little or no proof competently attributing respondent's relatively petty antisocial behavior to a psychiatric disorder of even remotely comparable dangerousness. Indeed, there remains considerable doubt as to whether respondent was even at the time of the 1983 assault for which he was eventually acquitted by reason of insanity, really insane. The record provides no indication

that respondent's not guilty by reason of insanity plea was ever contested, nor does it contain any records of psychiatric assessments reasonably contemporaneous with the assault which would have lent support to the plea had the claim of insanity been litigated. Respondent was not in the immediate aftermath of the 1983 arrest thought appropriate for psychiatric evaluation and, following his arraignment, was simply released on his own recognizance. As the majority rather strongly suggests, respondent's plea of insanity some four years subsequent to the incident for which he was charged may well have been motivated principally by his desire to avoid penal consequences. Had the plea been contested and respondent subjected to careful diagnostic evaluation in connection therewith, it is entirely possible if not probable that the defense of insanity would have been rejected. As Dr. Welner stated, "[W]ith respect to the NGRI * * * I did not evaluate him at the time and I believe if he was assigned a diagnosis of attention deficit hyperactivity disorder at that time he would never have been found not guilty by reason of insanity, because the notion of one and the other are on two completely different planes."

There is, in any case, apart from the 1983 incident, no other occasion on which respondent's misbehavior has been even somewhat reliably linked to dangerous mental illness. Notwithstanding the testimony respecting respondent's histrionics on the occasion of some of his arrests, it is clear that he was never thought an appropriate candidate for psychiatric evaluation and that he was invariably routinely processed through the criminal justice system. He was, moreover, in several of the cited incidents, convicted, albeit of relatively minor crimes, and incarcerated. While the conduct for which respondent was successfully prosecuted and punished was not admirable, neither can it be fairly regarded as indicative of anything but recidivist criminality. As for the remaining incidents, the credible proof at the hearing simply did not establish that the objectionable conduct had been the product of any serious underlying mental disorder. Indeed, based on the evidence adduced at the hearing, the only potentially dangerous psychiatric disorder respondent could have had was manic-depressive illness. But the weight of the evidence was clearly that respondent probably had never suffered from manic-depressive illness and that even if he had, that that disorder was not what had caused him repeatedly to misbehave. Although Dr. Poundstone did in his initial testimony

attempt to interpret respondent's behavior as it was summarized to him by appellants' trial counsel, as symptomatic of bipolar illness, he later indicated that the diagnosis of bipolar illness upon which his testimony had originally been premised was probably not correct. By the conclusion of the hearing it was, in fact, only Doctors Cruz and Ibanez who stood by the hypothesis that all of respondent's alleged criminal behavior had been actuated by prolonged periods of manic psychosis. Their clinical justification for the diagnosis was hardly persuasive as it was apparently made in almost complete ignorance of respondent's psychiatric history and was premised on certain highly dubious characterizations of respondent's statements and behavior. It was, for example, demonstrably untrue that respondent's claims of involvement in the formulation of plans for an auditorium to be placed atop the Pan Am Building were delusional; nor was it true, as the psychiatrists urged, that respondent's claims to the effect that his rights had been violated were delusional; nor could it have been fairly taken as symptomatic that respondent refused to concur in the diagnosis of bipolar disorder, particularly in light of the very strong evidence that he did not suffer from that disorder and that the diagnosis was, in fact, wrong; and, certainly, if the diagnosis was wrong, respondent evinced no sign of illness by refusing to be medically treated as if it were right. Respondent's refusal to take Prolixin can hardly be faulted much less cited as a diagnostically relevant sign when the antipsychotic drug was prescribed for him at a time when he was plainly not psychotic. Nor was respondent's resistance to additional lithium treatment diagnostically relevant in light of the fact that, as Dr. Poundstone testified after reviewing respondent's medical records, "lithium had never done him very much good."

It is apparent that in the absence of any sound clinical basis for the diagnosis they espoused, Doctors Ibanez and Cruz resorted simply to insisting that their diagnosis was correct[43] and then proceeded to hypothesize that on the occasion of each of the incidents described by the Assistant Attorney-General and Assistant District Attorney, respondent must have been in the midst of a manic episode. When finally pressed to provide some clinical substantiation for the claim

---

43. As noted above, Cruz claimed it was unnecessary to consult respondent's medical records since "[p]sychiatric certainty" confirmed the validity of his diagnosis (see, supra, n 24).

that respondent's antisocial behavior was invariably to be understood as a manifestation of bipolar illness, Cruz made the extraordinary statement that "I feel for the patient, that he has an illness, that I'm going to determine as much as I can if this is due to a physical problem. If he committed a crime, I would give that credit to him." Surely, it is one of the great ironies of the CPL 330.20 postverdict scheme that the District Attorney should end up a proponent of the testimony of a psychiatric expert who out of nothing more than professed empathy with a defendant states in so many words that if the defendant committed a criminal act it must have been by reason of mental illness!

Contrary to the testimony of Cruz and Ibanez, it was quite evident by the conclusion of the hearing that respondent most probably suffered from no more serious an underlying psychiatric disorder than attention deficit hyperactivity disorder. None of the remaining four psychiatric experts had, after careful diagnostic evaluation, found any direct clinical or historical evidence of prolonged manic episodes; all noted that respondent had not been responsive to lithium and that he remained clinically clear of major bipolar symptoms without lithium. And, it had additionally been established through the testimony of Dr. Poundstone that respondent had shown improvement while medicated with Cylert, a drug from which he would not have benefitted and which might in fact have been detrimental to him had the attention deficit hyperactivity diagnosis been incorrect.

Attention deficit disorder, however, is not a dangerous mental disorder. Indeed, not one of the psychiatric experts had ever previously seen a patient hospitalized for its treatment much less confined to a secure psychiatric facility. Nor was there evidence that respondent had suffered from so severe a case of the otherwise relatively benign disorder as to render credible the hypothesis, never seriously pursued, that respondent had committed all of his offensive acts under its sway. Rather, the credible evidence established overwhelmingly that the precipitant of respondent's antisocial behavior was alcohol and drug abuse.

On the present record, this Court is being asked to sanction the confinement of an individual to a secure psychiatric facility not, as the statute provides, because he is currently mentally ill and physically dangerous by reason of that illness, but because like many other people who tolerate drugs

and alcohol less than gracefully he becomes extremely obnoxious and sometimes violent under their influence.

The prospect, however likely, that a person free of major psychiatric symptomatology may at some point take a drink and become dangerous is not a constitutionally adequate basis for involuntary psychiatric hospitalization much less for confinement to a secure psychiatric hospital. What the majority has done, perhaps unwittingly in this case, in which a vindictive response to a person who has repeatedly acted in a socially irresponsible fashion may seem deeply satisfying and popular, is to embrace with open arms the concept of preventive detention. The use of involuntary psychiatric confinement to protect society from a person who, although in remission from psychiatric illness, remains dangerous has been soundly rejected by the Supreme Court in *Foucha (supra)* as violative of due process and equal protection. As the *Foucha* Court reiterated, "[d]ue process requires that the nature of commitment bear some reasonable relation to the purpose for which the individual is committed [citations omitted]" *(Foucha v Louisiana,* 504 US, *supra,* at —, 112 S Ct, *supra,* at 1785). Thus, a person like Foucha or like respondent whose psychiatric illness has gone into remission and who no longer manifests symptoms of a major psychiatric illness the treatment of which in an inpatient setting is either necessary or even medically advisable, cannot be held against his or her will in a psychiatric hospital. This is true even if, like Foucha, the individual remains dangerous. It is all the more true if, as is the case with respondent, the individual is not presently dangerous but there is merely a prospect that he or she will become dangerous. In either case a mere propensity, however well demonstrated, for antisocial conduct is not a sufficient constitutional predicate for forcible psychiatric commitment. As was aptly noted in *Torsney* (47 NY2d, *supra,* at 683), "[w]hatever its label, confinement on a showing of mere propensity amounts to nothing more than preventive detention, a concept foreign to our constitutional order [citations omitted]."

While appellants will doubtless protest that Foucha was not mentally ill whereas respondent is, it is clear that neither defendant was mentally ill in a constitutionally significant sense. Plainly, both suffered from some underlying psychiatric and psychological disorders. Neither, however, was shown to suffer from any presently symptomatic major psychiatric disorder for which inpatient treatment was necessary or even

clinically desirable. Accordingly, the statutorily relevant definition of mental illness is not the broad, conversational one encompassing any kind of mental pathology, but one expressly limited to seriously symptomatic psychiatric disorders *(see,* CPL 330.20 [14]; Mental Hygiene Law § 1.03 [20]). Assessed by that standard, respondent was shown to be no more mentally ill than Foucha.

The majority's determination to trifle with respondent's constitutionally and, indeed, statutorily protected liberty interest would be most unfortunate in any case but is particularly so in the context of the present litigation, for it should be clear that this case presents no occasion for tinkering with the statute's very clear substantive standards for commitment to a secure psychiatric facility. It is only by virtually ignoring respondent's plainly meritorious jurisdictional claims and, in so doing, sanctioning an application of the statute which not even the statute by its terms can be reasonably read to permit, and by similarly ignoring respondent's plainly meritorious constitutional challenge, that the majority manages to immerse itself directly in the judicial revision of the statute's commitment standards. Even if the result of this foray was not to render the statute even more violative of due process and equal protection than the Legislature had already made it, it would constitute an extremely imprudent use of judicial power. The revision of this statute or any other is the work of the Legislature, not the courts.

Undoubtedly, it appears to my colleagues that, constitutional and jurisprudential considerations aside, the revision it would effect is most sensible as a matter of public policy; that it will help rid the streets of potentially dangerous substance abusers. The revision of CPL 330.20, however, cannot but have the most miniscule such result since the statute applies only to insanity acquittees who constitute but a tiny fraction of the population of alcohol and substance abusers. But even if, as is suggested, involuntary psychiatric commitment standards may be generally relaxed to commit, without more, those with a demonstrated propensity to drug- and alcohol-induced misbehavior, it would be well to consider carefully whether such a relaxation would pay the societal dividends the majority apparently anticipates. The outcome of such a relaxation would undoubtedly be to turn our psychiatric hospitals into large detention centers for persons who, although suffering from no psychiatric illness requiring inpatient care, had repeatedly committed crimes and other antisocial acts while intoxicated

and would likely do so again. If such persons are committable by reason of their propensities, we may wish to ask ourselves when, if ever, they would be suitable for release, and in the interim while our hospitals are full of preventively detained, psychiatrically asymptomatic persons, what we will do to care for those genuinely in need of inpatient psychiatric care because they are indeed mentally ill and dangerous. Inpatient psychiatric resources are not infinite and those that there are are extremely expensive. It is an altogether dubious proposition that those resources should be dedicated to detaining persons who have no immediate need of inpatient psychiatric care. It is an even more dubious proposition that the reallocation of those resources should effectively be dictated by Judges.

If respondent commits crimes, he should be prosecuted and penalized; it is, in this connection, nowhere explained why respondent has not been more vigorously prosecuted for the crimes with which he has been intermittently charged. It does no good to complain, as do appellants, that respondent is a "master of manipulation", a veritable Moriarty, eluding penal sanction at every turn, when respondent's not responsible plea was accepted, apparently without contest, and criminal charges against him have frequently gone unpursued, more than once at the People's election. If, on the other hand, respondent is mentally ill and in some measure dangerous, he can be civilly committed. What cannot be done, however, either in accordance with the statute's terms or the Constitution is to recommit the respondent to a secure psychiatric hospital pursuant to CPL 330.20. More than a decade after the acts leading to respondent's insanity acquittal, and after an intervening judicial determination that respondent was no longer dangerous, respondent simply cannot be resubjected either pursuant to the statute or the Constitution to the dramatically disparate recommitment provisions of CPL 330.20. But, even if respondent does at this late date fall within the statute's permissible ambit, it is plain that neither the statute nor the Constitution permit respondent's detention upon the grossly deficient predicate established at the recommitment hearing.

Accordingly, the order of the Supreme Court, New York County (Edith Miller, J.), entered February 1, 1993, which after a hearing denied the appellants' application seeking recommitment of respondent pursuant to CPL 330.20, should be reversed, on the law, the determination on the merits

vacated, and the respondent's motion to dismiss the application on jurisdictional grounds granted.

CARRO, WALLACH and NARDELLI, JJ., concur; MURPHY, P. J., dissents in a separate opinion.

Order, Supreme Court, New York County, entered on February 1, 1993, which denied the appellants' application seeking recommitment of the respondent, pursuant to CPL 330.20 (14), reversed, on the law and the facts, and the application granted.